1   John V. Picone III (State Bar No. 187226)
    jpicone@hopkinscarley.com
2   Dori L. Yob (State Bar No. 227364)
    dyob@hopkinscarley.com
3   HOPKINS & CARLEY
    A Law Corporation
4   The Letitia Building
    70 South First Street
5   San Jose, CA  95113-2406

6   *mailing address:*
    P.O. Box 1469
7   San Jose, CA 95109-1469
    Telephone:    (408) 286-9800
8   Facsimile:    (408) 998-4790

9   Attorneys for Plaintiffs
    AVAGO TECHNOLOGIES U.S., INC., AVAGO
10  TECHNOLOGIES INTERNATIONAL SALES
    PTE. LIMITED, AVAGO TECHNOLOGIES
11  JAPAN, LTD., AVAGO TECHNOLOGIES
    CANADA CORPORATION

12

13                  UNITED STATES DISTRICT COURT

14               NORTHERN DISTRICT OF CALIFORNIA

15                        SAN JOSE DIVISION

16  AVAGO TECHNOLOGIES U.S., INC., a        CASE NO. 008 03248 HRL
    Delaware corporation, AVAGO
17  TECHNOLOGIES INTERNATIONAL              **COMPLAINT FOR:**
    SALES PTE. LIMITED, AVAGO
18  TECHNOLOGIES JAPAN, LTD.,               **(1) BREACH OF CONTRACT; NON-**
    AVAGO TECHNOLOGIES CANADA                  **CONFORMING GOODS;**
19  CORPORATION,                            **(2) BREACH OF EXPRESS WARRANTY;**
                                                **AND**
20              Plaintiffs,                  **(3) NEGLIGENT INTERFERENCE WITH**
                                                **PROSPECTIVE ECONOMIC**
21      v.                                      **ADVANTAGE**

22  EMCORE CORPORATION, a New Jersey        **DEMAND FOR JURY TRIAL**
    corporation; VENTURE CORPORATION
23  LIMITED fka VENTURE
    MANUFACTURING (S) LTD., a
24  Singapore corporation,

25              Defendants.

26

27          Avago Technologies U.S., Inc., Avago Technologies International Sales Pte. Limited,

28  Avago Technologies Japan Ltd., Avago Technologies Canada Corporation (hereinafter

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

590829.2

COMPLAINT FOR (1) BREACH OF CONTRACT; NON-CONFORMING GOODS; (2) BREACH OF EXPRESS WARRANTY; AND
(3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; DEMAND FOR JURY TRIAL

1    collectively "Avago" unless otherwise noted), states its Complaint against Venture Corporation

2    Limited., and Emcore Corporation, as follows:

3                                            **PARTIES**

4           1.      Plaintiff Avago Technologies U.S., Inc. (hereinafter "Avago U.S.") is a Delaware

5    Corporation, doing business in the State of California with its principal place of business at 350

6    West Trimble Road, San Jose, California 95131.

7           2.      Plaintiff Avago Technologies International Sales Pte. Limited (hereinafter "Avago

8    International Sales") is an entity organized under the laws of the republic of Singapore, and has

9    its principal place of business outside of the United States.

10          3.      Plaintiff Avago Technologies Japan, Ltd. (hereinafter "Avago Japan") is an entity

11   organized under the laws of Japan, and has its principal place of business outside of the United

12   States.

13          4.      Plaintiff Avago Technologies Canada Corporation (hereinafter "Avago Canada")

14   is an entity organized under the laws of Canada, and has its principal place of business outside of

15   the United States.

16          5.      Defendant, Venture Corporation Limited ("Venture") is a Singaporean company,

17   with its principal place of business at 5006 Ang Mo Kio Ave 5, #5-01/12, Techplace II, Singapore

18   569873.

19          6.      Defendant, Emcore Corporation ("Emcore") is a New Jersey Corporation, with its

20   principal place of business in Albuquerque, New Mexico.

21                                          **JURISDICTION**

22          7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 (diversity

23   of citizenship) in that Emcore is a company having its principal place of business or

24   domicile/residence in a different jurisdiction than any of the Plaintiffs, Venture is a foreign

25   defendant, and the amount in controversy here exceed $75,000 exclusive of interest and costs.

26   / / /

27   / / /

28   / / /

590829.2                                          - 2 -

COMPLAINT FOR (1) BREACH OF CONTRACT; NON-CONFORMING GOODS; (2) BREACH OF EXPRESS WARRANTY; AND
(3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; DEMAND FOR JURY TRIAL

**INTRADISTRICT ASSIGNMENT**

8.     Pursuant to Local Rule 3-2(c) and 3-5(b), this action is brought in the San Jose division because a substantial part of the events or omissions which give rise to the claim occurred in Santa Clara County.

**VENUE**

9.     Venue is proper as to Venture in the United States District Court for the Northern District of California pursuant to section 30.8 of the contract between Avago and Venture which provides "[i]n the event of a dispute that is not resolved under the dispute resolution procedures provided below, the Parties agree that suit may be brought only in a court of competent jurisdiction in the State of California."

10.     Venue is proper as to Emcore in the United States District Court for the Northern District of California pursuant to 28 U.S.C. §1391 in that Avago resides within this jurisdiction, a substantial part of the events and omissions giving rise to the claim occurred within this jurisdiction and Emcore is subject to personal jurisdiction within this district.

**GENERAL ALLEGATIONS**

11.     Avago is a supplier of analog interface components for communications, industrial, and consumer applications.  Avago serves three primary product categories comprising optoelectronics, RF/microwave components, and enterprise ASICs (Application Specific Integrated Circuits).  Avago's products serve four end markets: industrial and automotive, wired infrastructure, wireless communications, and computer peripherals.

12.     One of the key products in Avago's optoelectronics category is its line of fiber optic transceivers.  Avago's portfolio of Ethernet, SONET and Fibre Channel transceivers supports all speeds, and includes transmitters and receivers for industrial and automotive applications.  An essential component of Avago's fiber optic transceivers is a Vertical Cavity Surface Emitting Laser (hereinafter "VCSEL" [pronounced "vixel"]).  A VCSEL is a type of laser diode that emits light from its surface rather than its edge, producing a circular beam that is easy to couple with a fiber.

/ / /

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

590829.2

- 3 -

COMPLAINT FOR (1) BREACH OF CONTRACT; NON-CONFORMING GOODS; (2) BREACH OF EXPRESS WARRANTY; AND
(3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; DEMAND FOR JURY TRIAL

1        13.    In or about May 1, 2002, Agilent Technologies Incorporated entered into a Global

2  Manufacturing Services Agreement ("Agreement" or "GMSA") with Venture whereby Venture

3  agreed to manufacture, test, pack, ship, and sell certain products in accordance with the

4  specifications and other product requirements provided by Avago.  A true and correct copy of the

5  Agreement is attached hereto as **Exhibit A**.  In or about November 2005, the Agreement was

6  assigned to Avago from Agilent Technologies Incorporated.

7        14.    Among other things, Venture agreed to manufacture fiber optic transceivers for

8  Avago.  Venture subcontracted with Emcore for the VCSEL die used in the transceivers.  Venture

9  manufactured the transceivers using the VCSEL die from Emcore, and sold the finished fiber

10  optic transceivers to Plaintiff Avago International Sales.  Avago International Sales subcontracted

11  the sale of the fiber optic transceivers to Avago U.S., Avago Japan, and Avago Canada.  Avago

12  U.S., Avago Japan, and Avago Canada sold the finished transceivers to their customers in their

13  particular sales regions, including, but not limed to, Cisco, ATI, Juniper, Hewlett Packard,

14  Huawei, and Portwell.  Avago had contracts to deliver finished transceivers to its customers and

15  execution of those contracts would have resulted in significant financial return to Avago.  Upon

16  information and belief, Venture and Emcore knew that the VCSEL die would be incorporated into

17  the finished transceivers and that those products would be sold to Avago's customers.  Venture

18  and Emcore either knew, or should have known, that Emcore's negligent manufacturing and

19  Venture's breach of the Agreement would result in disruption of specific commercial

20  relationships with Avago's customers involving the VCSEL die and finished transceivers.

21  Moreover, Avago's commercial relationships with its customers involving the VCSEL die and

22  finished transceivers have been disrupted.

23        15.    Beginning in or about November 2006, Avago's customers began reporting field

24  failures of certain fiber optic transceivers manufactured for Avago by Venture.  Avago accepted

25  return of the defective products, made provisions for either repair or replacement and expended

26  numerous engineering, administrative and legal resources in dealing with unsatisfied customers.

27  / / /

28  / / /

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

590829.2                 - 4 -

COMPLAINT FOR (1) BREACH OF CONTRACT; NON-CONFORMING GOODS; (2) BREACH OF EXPRESS WARRANTY; AND
(3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; DEMAND FOR JURY TRIAL

1  Upon information and belief, through a process of reverse engineering and independent

2  laboratory analysis, Avago, Venture, and Emcore were able to ascertain that the failures in the

3  fiber optic transceivers were a result of a delamination between the mirror layers of the Emcore

4  VCSEL die sold to Venture.

5        16.    As a result of Venture's and Emcore's actions, Avago sold and delivered millions

6  of fiber optic transceivers containing the defective VCSEL die to its customers.

7        17.    Avago has suffered significant monetary loss and harm to its reputation as a direct

8  and proximate result of Emcore's sub-standard manufacturing and Venture's breach of the

9  Agreement.

10       18.    Despite repeated demands, Emcore and Venture have failed and refused and

11  continue to fail and refuse to compensate Avago for the defective components and/or the other

12  damages caused as a result of the defective products.

### FIRST CAUSE OF ACTION
#### (Breach of Contract; Non-Conforming Goods Against Venture)

15       19.    Avago incorporates by reference paragraphs 1 through 19 of this Complaint as

16  though fully set forth herein.

17       20.    From 2005 through 2007, Avago purchased approximately 5.7 million fiber optic

18  transceivers from Venture under the terms of the GMSA.  The GMSA is an Agreement for the

19  "sale of goods" as that phrase is defined under the Commercial Code.

20       21.    The Agreement requires all products to conform strictly to the Product

21  Requirements, Specifications, and all other criteria referenced in the Agreement.

22       22.    Avago purchased the finished fiber optic transceivers from Venture and sold them

23  to its customers.

24       23.    Beginning in or about November 2006, Avago's customers began reporting field

25  failures of the fiber optic transceivers manufactured for Avago by Venture and returned the

26  defective products to Avago.  Avago issued credits to its customers and/or replaced the defective

27  fiber optic transceivers and reported the problems to Venture.

28  ///

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

590829.2

- 5 -

COMPLAINT FOR (1) BREACH OF CONTRACT; NON-CONFORMING GOODS; (2) BREACH OF EXPRESS WARRANTY; AND
(3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; DEMAND FOR JURY TRIAL

24.    On information and belief, the fiber optic transceivers failed as a result of a delamination between the mirror layers of the VCSEL wafers.

25.    Venture breached the Agreement by, among other things, providing Avago with non-conforming products.

26.    Avago has performed all covenants, conditions, and promises to be performed on its part under the terms of the Agreement.

27.    Avago has made demand on Venture to perform all covenants and conditions required of it under and pursuant to the Agreement. Venture has failed and refused, and continues to fail and refuse to honor its obligations under the Agreement.

28.    As a direct and proximate result of the breach of the Agreements by Venture, Avago has been damaged in an amount exceeding the jurisdictional minimum limit of this Court.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION
### (Breach of Express Warranty Against Venture)

29.    Avago incorporates by reference paragraphs 1 through 29 of this Complaint as though fully set forth herein.

30.    Venture expressly warranted that all Products provided to Avago under the Agreement, including the fiber optic transceivers, would "conform strictly to the Product Requirements (Including those Specifications listed in Exhibit B)" and would conform to all other criteria referenced in the Agreement.

31.    Venture also expressly warranted that all Products provided to Avago under the Agreement, including the fiber optic transceivers, would "[b]e free from defects in workmanship as specified in the Agilent Acceptability Specification 930.610, as listed in Exhibit B"

32.    These promises became part of the basis of the bargain between Venture and Avago.

/ / /

/ / /

/ / /

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

590829.2                                         - 6 -
COMPLAINT FOR (1) BREACH OF CONTRACT; NON-CONFORMING GOODS; (2) BREACH OF EXPRESS WARRANTY; AND
(3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; DEMAND FOR JURY TRIAL

1    33.    Venture materially breached its express warranties by failing to produce fiber optic

2    transceivers that confirmed to the specifications and met all quality requirements.

3    34.    As a direct and proximate result of the breach of the Agreements by Venture,

4    Avago has been damaged in an amount exceeding the jurisdictional minimum limit of this Court.

5    WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

6    **THIRD CAUSE OF ACTION**
     **(Negligent Interference with Prospective Economic Advantage against Emcore)**

7

8    35.    Avago incorporates by reference paragraphs 1 through 35 of this Complaint as

9    though fully set forth herein.

10    36.    Avago and Venture entered into an Agreement whereby Venture agreed to

11    manufacture, test, pack, ship, and sell certain products to Avago in accordance with specifications

12    and other product requirements provided by Avago.  The Agreement contained reasonably

13    probable future economic benefit or advantage to Avago.

14    37.    Venture subcontracted with Emcore for the VCSEL die used in certain fiber optic

15    transceivers that Venture agreed to manufacture for Avago pursuant to the Agreement.  Upon

16    information and belief, Emcore knew of the existence of the relationship between Venture and

17    Avago and the relationship between Avago and its customers.  Upon information and believe,

18    Emcore was also aware that the VCSEL die would be incorporated into finished fiber optic

19    transceivers and sold to Avago's customers.  Emcore was aware, or should have been aware, that

20    if it did not act with due care in design and manufacture of the VCSEL die sold to Venture, that

21    its action would interfere with the relationship between Venture and Avago and Avago and its

22    customers.  Upon information and belief, Emcore knew, or should have known, that negligent

23    design and manufacture of the VCSEL wafers/die and would cause Avago to lose in whole or in

24    part probable future economic benefit or advantage reasonably expected from the relationships

25    predicated upon sales of the finished transceivers.

26    / / /

27    / / /

28    / / /

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

590829.2                                                        - 7 -

1    38.    Beginning in or about November 2006, Avago's customers began reporting field

2    failures of certain fiber optic transceivers manufactured for Avago by Venture.  Upon information

3    and belief, through a process of reverse engineering and independent laboratory analysis, Avago

4    was able to ascertain that the failures in the fiber optic transceivers were a result of Emcore's

5    negligent manufacture of the VCSEL wafers that resulted in a delamination between the mirror

6    layers of the VCSEL.

7    39.    Avago suffered harm as a result of the defective VCSEL die in that Avago's

8    customers began reporting field failures of the fiber optic transceivers and Avago was forced to

9    compensate its customers for the defective products and/or cover with replacement products.

10   Emcore's negligence caused damage to Avago in that its relationship with Venture and its

11   relationship with it customers were actually interfered with or disrupted and Avago lost in whole

12   or in part economic benefits or advantage reasonably expected from those relationships.

13   40.    The damage suffered by Avago was closely connected to, and indeed directly

14   caused by the defective VCSEL die manufactured by Emcore.

15   41.    Emcore's failure to exercise due care in the design and manufacture of the VCSEL

16   die and its lack of diligence in resolving the problem is particularly blameworthy since it was the

17   origin of the harm to Avago and continued even after the cause of the field failures was brought

18   to Emcore's attention.

19   42.    As a direct and proximate result of the Emcore's negligence and subsequent

20   interference with Avago's prospective economic advantage, Avago has been damaged in an

21   amount exceeding the jurisdictional minimum limit of this Court.

22   WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

23   **PRAYER**

24   WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

25   1.    For judgment in an amount which will compensate Plaintiff for any loss or damage

26   sustained as a result of the acts of Defendants;

27   2.    For interest on the applicable sums at the prevailing rate;

28   / / /

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

590829.2                                    - 8 -
COMPLAINT FOR (1) BREACH OF CONTRACT; NON-CONFORMING GOODS; (2) BREACH OF EXPRESS WARRANTY; AND
(3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; DEMAND FOR JURY TRIAL

1       3.    For special and consequential damages according to proof;

2       4.    For attorneys' fees and costs of suit incurred herein; and

3       5.    For such other and further relief as the Court deems just and proper.

Dated: July 3, 2008

HOPKINS & CARLEY
A Law Corporation

By: _____
Dori L. Yob
Attorneys for Plaintiffs
AVAGO TECHNOLOGIES U.S., INC.,
AVAGO TECHNOLOGIES
INTERNATIONAL SALES PTE.
LIMITED, AVAGO TECHNOLOGIES
JAPAN, LTD., AVAGO
TECHNOLOGIES CANADA
CORPORATION

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

590829.2

- 9 -

COMPLAINT FOR (1) BREACH OF CONTRACT; NON-CONFORMING GOODS; (2) BREACH OF EXPRESS WARRANTY; AND
(3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; DEMAND FOR JURY TRIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs Avago Technologies U.S., Inc., Avago Technologies International Sales Pte. Limited, Avago Technologies Japan Ltd., and Avago Technologies Canada Corporation hereby demand trial by jury of all issues so triable.

Dated: July __3__, 2008

HOPKINS & CARLEY
A Law Corporation

By _____
Dori L. Yob
Attorneys for Plaintiffs
AVAGO TECHNOLOGIES U.S., INC.,
AVAGO TECHNOLOGIES
INTERNATIONAL SALES PTE.
LIMITED, AVAGO TECHNOLOGIES
JAPAN, LTD., AVAGO
TECHNOLOGIES CANADA
CORPORATION

COMPLAINT FOR (1) BREACH OF CONTRACT; NON-CONFORMING GOODS; (2) BREACH OF EXPRESS WARRANTY; AND (3) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; DEMAND FOR JURY TRIAL

AGILENT CONFIDENTIAL

# Global Manufacturing Services Agreement

# Between

# Agilent Technologies, Inc.

# And

# Venture Manufacturing (S) Ltd.

# Agreement Number 02-04M

AGILENT CONFIDENTIAL

# TABLE OF CONTENTS

1.0   SCOPE OF AGREEMENT ................................................................1

2.0   DEFINITIONS ...............................................................................3

3.0   PROTOTYPES ............................................................................10

4.0   OWNERSHIP................................................................................10

5.0   PRODUCT PURCHASES............................................................12

6.0   DELIVERY AND ACCEPTANCE ...............................................14

7.0   PRICES AND PAYMENT TERMS .............................................15

8.0   COST MANAGEMENT ................................................................16

9.0   COMPONENT PROCUREMENT ...............................................17

10.0  WARRANTIES .............................................................................19

11.0  RETURN OF NON-CONFORMING PRODUCTS ......................20

12.0  PRODUCT SUPPORT .................................................................21

13.0  OBSOLESCENCE AND MANUFACTURING RIGHTS .............23

14.0  INVENTORY MANAGEMENT ...................................................25

16.0  CHANGE NOTIFICATION.........................................................28

17.0  AGILENT PROPERTY ................................................................29

18.0  VENTURE INTELLECTUAL PROPERTY DEFENSE................31

19.0  AGILENT INTELLECTUAL PROPERTY DEFENSE ...............32

20.0  CONFIDENTIAL INFORMATION.............................................33

21.0  GOVERNMENTAL COMPLIANCE............................................33

22.0  COUNTRY OF MANUFACTURE AND DUTY DRAWBACK RIGHTS ..................34

23.0  ELECTRONIC DATA INTERCHANGE (EDI) REQUIREMENTS ...........................34

24.0  FORCE MAJEURE EVENTS.......................................................35

AGILENT CONFIDENTIAL

25.0 EVENTS OF DEFAULT ..................................................................................35

26.0 TERMINATION .......................................................................................................36

27.0 LIMITATION OF LIABILITY ...............................................................................38

28.0 INSURANCE REQUIREMENTS ..........................................................................38

29.0 BUSINESS CONTINUITY PLAN .........................................................................39

30.0 MISCELLANEOUS ................................................................................................40

AGILENT CONFIDENTIAL

## GLOBAL MANUFACTURING SERVICES AGREEMENT

THIS GLOBAL MANUFACTURING SERVICES AGREEMENT ("Agreement" or "MSA") is entered into and is effective as of 1 May 2002 (the "Effective Date") by and between AGILENT TECHNOLOGIES, INCORPORATED. ("Agilent"), a Delaware corporation with a principal place of business at 5301 Stevens Creek Blvd, Santa Clara, CA., and Venture Manufacturing Singapore Ltd. ("Venture"), a Singapore company with a principal place of business at 5006 Ang Mo Kio Ave 5, #05-01/12, Techplace II, Singapore 569873, singularly or collectively referred to as a Party or the Parties.

The Parties hereby agree as follows:

**1.0 Scope of Agreement**

   1.1   <u>Venture General Obligations</u>.  This Agreement specifies the terms and conditions under which Venture agrees to manufacture and sell Products described in this Agreement, based on the requirements provided by Agilent.  Without limiting any specific obligation specified in this Agreement, Venture will:

      1.1.1  Maintain one or more manufacturing processes and production lines, purchase or procure Tools, and source Components and materials as needed to fulfill Venture's obligations to manufacture the Products in accordance with the Specifications set forth in <u>Exhibit B</u> and the other Product Requirements provided by Agilent.

      1.1.2  Manufacture, test, pack, ship and sell all Products in accordance with the terms of this Agreement.

      1.1.3  Apply its best efforts to continuously reduce its manufacturing costs and, upon request, provide to Agilent information and access to production cost information to ensure compliance with this obligation as described in <u>Sections 7 and 8</u> below.

      1.1.4  Meet the Supplier Performance Expectations described in <u>Section 15</u> below, and develop and maintain quality control standards consistent with those standards described in that Section.

      1.1.5  Obtain all necessary approvals and certifications to enable Venture to manufacture the Products under this Agreement and make all necessary safety standard changes as required hereunder.

      1.1.6  On Agilent's request, provide all Technical Assistance, for a fee to be agreed upon by both Parties pursuant to this Agreement.

      1.1.7  Provide the warranty and support services as described in <u>Sections 11 and 12</u> below.

      1.1.8  Put in place a customer-focused overall account management team consisting of the Venture Global Account Manager, Venture Site Specific Program Managers and Venture Tactical Program Managers.  This team will be 100% dedicated to the

Agilent business relationship and whose performance rating will be based upon the ongoing success of Agilent's business within Venture.

1.2    Agilent General Obligations.  Without limiting any specific obligation required under this Agreement, Agilent will provide to Venture Product Requirements consisting of, but not necessarily limited to:

a)    Product numbers;
b)    Bill of Material ("BOM");
c)    Agilent Approved Vendor List ("AVL);
d)    EPROM software and code;
e)    Board placement data (Gerber files);
f)    Raw PCB information required to procure Raw PCB;
g)    Schematic drawings, if test required;
h)    Assembly drawings;
i)    Packaging requirements, workmanship and quality specifications;
j)    General Technical Specifications;
k)    Buy/Sell Component List; and
l)    Consigned Component List.

1.3    Term of Agreement.  This Agreement will commence as of the Effective Date and will continue for the five (5) years unless otherwise indicated in a Business Unit Addendum or terminated earlier under the terms of this Agreement.   After the initial Term, this Agreement will automatically renew for a Contract Year unless either Party notifies the other Party in writing within three (3) months prior to the expiration of the initial Term or of any additional term.   Notwithstanding the above, the Parties shall conduct an annual review of the terms of this Agreement and the business relationship between the Parties one (1) month prior to each anniversary date of this Agreement during the initial Term and, where mutually agreed, may make any changes.

1.4    Eligible Buyers.   Unless otherwise provided in a Business Unit Addendum, this Agreement enables all Agilent Business Units and those other Eligible Buyers listed in Exhibit L to purchase the Products from Venture under the terms set forth below.   All Purchases made by Eligible Buyers will be governed by the terms and conditions of this Agreement.

1.5    Business Unit Addenda.   Whenever an Agilent Business Unit requires additional or different terms and conditions, such terms will be set forth in a Business Unit Addendum signed by Venture and the designated Agilent Business Unit Manager.  A form of Business Unit Addendum is appended hereto as Exhibit Q.  Each Business Unit Addendum will be appended to this Agreement and incorporated herein.   To the extent of any conflict between the terms of a Business Unit Addendum and the terms of this Agreement, the terms of the Business Unit Addendum will control and take precedence.

1.6    Additional Services.  The Parties may agree to add additional services from time to time. Prior to commencing any such services, Venture will provide Agilent a written proposal

that will include a description of the services to be performed and the total estimated fees. Venture agrees to propose fee rates on both a time and material and fixed price basis at Agilent's request.   As needed, the parties will enter into a Statement of Work ("SOW") signed by both Parties to initiate each service referencing this Agreement and becoming subject to its terms and conditions.   However, to the extent of any conflict between the terms of a SOW and these terms, the terms of the SOW will control and take precedence.

## 2.0   Definitions

The following capitalized terms will have the meanings given for the purposes of this Agreement:

2.1   "Acceptable Quality Level (AQL)" means the maximum number of Non-conforming Products allowed by Agilent in each Lot manufactured by Venture.

2.2   "Agilent Business Unit Manager" means that person designated in an Agilent Business Unit Addendum who will oversee the relationship between Venture and that individual Agilent Business Unit.  The Agilent Business Unit Manager's role will include conducting performance and quality reviews, receiving and reviewing required reports, plans and notices, implementing changes in the scope of any services or project, and resolving any conflicts or disputes on a Business Unit level.

2.3   "Agilent Business Unit" refers to any of Agilent's Business Units, Divisions, Groups, or business sectors including ATG, LSCA, CSG, EPSG, or SPG; and, any successor or renamed division, groups, or business units of Agilent comprising the business lines currently carried on by an Agilent Business Unit (provided Agilent provides prior written notice to Venture and Exhibit L is amended accordingly).

2.4   "Agilent Part Number" refers to the unique, Agilent or Agilent-assigned reference number for a particular assembly or Component.

2.5   "Agilent Property" will mean all property that Agilent may provide to Venture for assembly into Products, such as Consigned Component inventories, as well as any designs, documentation, Product Requirements, Tools, Test Fixtures, Test Software, and other test equipment and other materials that Agilent may furnish to Venture or that Agilent may pay for in connection with this Agreement for Venture's use in performing any of its obligations hereunder.  All Agilent Property will be considered "Bailed Property," which will remain the property of Agilent under the provisions set forth in Section 17 below.

2.6   "Approved Vendor List", also referred to as "AVL", refers to the confidential list of Agilent Approved Vendors who are qualified Component Suppliers authorized by Agilent for use in the manufacture of Products.

2.7   "Bill of Material", also referred to as "BOM", means the list of all Components, Agilent Part Numbers, quantity per assembly, and Venture's part number where applicable, that is used to assemble each Product.

AGILENT CONFIDENTIAL

2.8     "<u>Bridge Buy</u>" means the purchase, consignment or other procurement of Components and other Product manufacturing supplies to meet Agilent current and anticipated demand necessitated by Product discontinuance and/or transfer of manufacturing responsibility to another contract manufacturing service provider.

2.9     "<u>Business Unit Addendum</u>" means that agreement negotiated by an Agilent Business Unit that defines the services to be performed, the Products to be manufactured for such Business Unit, Product Requirements, Product pricing, New Product Introduction criteria, Supplier Managed Inventory programs, demand and order flexibility guidelines, and such other items as may be referenced in this Agreement or agreed to the Parties.

2.10    "<u>Buy/Sell Component</u>" means a Component that Agilent desires to sell to Venture for use in the manufacturing of the Products.  There are three categories of Buy/Sell components:

   a)     Permanent Buy/Sell:  Component Parts that Agilent will sell to Venture on an ongoing basis.

   b)     Shortage Pull:  Component parts that Agilent sells to Venture in the event that Venture has a shortage scenario, or Agilent has additional inventory available to sell to Venture.

   c)     Seeding Buy/Sell: A one-time transition sale of Component parts that Agilent sells to Venture for the support of new Product that is scheduled to be manufactured by Venture.

2.11    "<u>Change Order</u>", also referred to as a "<u>CO</u>", is the written notification provided to Venture by Agilent to modify the delivery of a Product, as further described in <u>Section 16.2</u> below.

2.12    "<u>Common Components</u>" mean industry-standard (i.e., off the shelf, non-custom) Components that can be used by or sold to multiple customers.

2.13    "<u>Component</u>" means the piece parts, subassemblies, software, OEM components and products, and all other materials incorporated by Venture into Products built for Agilent Eligible Buyers.

2.14    "<u>Component Supplier</u>" means qualified suppliers authorized by Agilent for use in the manufacture of Agilent Products.

2.15    "<u>Consigned Components</u>" refers to those Components provided to Venture for assembly into Products where Agilent retains all ownership interest and obligations in those Consigned Components.

2.16    "<u>Contract Year</u>" is a one (1) year period commencing from the Effective Date, and each additional twelve (12) month period thereafter during the Term of this Agreement.

2.17    "<u>Custom Material</u>" means any Components that are purchased or manufactured parts that are not industry standard parts or purchased or developed by Venture specifically to meet Product Requirements.

2.18    "Deliverables" refers to Products, Components, Developments, Prototypes, Test Software, and other work provided by Venture to Agilent as required hereunder.

2.19    "Delivery Date" means the date specified in an Order for the delivery of Products.

2.20    "Developments" means any new inventions, discoveries, technologies, processes, or materials (whether or not patentable) developed in connection with Venture's performance under this Agreement relating to a Product's Requirements or design.

2.21    "EDI" means Electronic Data Interchange.

2.22    "Eligible Buyer" means any Agilent subsidiary or Agilent Business Unit, any Agilent joint venture partner or third party authorized to purchase Products from Venture.

2.23    "Encumbrance" means any encumbrance, lien, charge, hypothecation, pledge, mortgage, title retention agreement, security interest of any nature, adverse claim, exception, right of set-off, any matter capable of registration against title, option, right of pre-emption, privilege or any contract to create any of the foregoing.

2.24    "Engineering Changes" means any material, electrical, mechanical or chemical changes to the Products proposed by Agilent or Venture that would affect, but not be limited to, Product performance, reliability, safety, environmental compatibility, serviceability, appearance, dimensions, tolerances, or composition.

2.25    "Engineering Responsibility" means the set of responsibilities given to an Agilent Business Unit for a Product or Component used within Agilent, including design, change and configuration control and responsibility for manufacturing, documentation, application, Product safety, international use, Product support and Product discontinuance.

2.26    "ESD" means Electrostatic Discharge.

2.27    "Excess Components" means Components on-hand at Venture that are greater than the then current eighteen (18) weeks forecast.

2.28    "Forecast" means Agilent's rolling estimate of its purchase requirements over a six (6) month period as further described in Section 5.4 below, or such other period designated by the Parties.

2.29    "Global Account Managers" or "Alliance Managers" means those persons designated in Exhibit A to this Agreement responsible for the overall coordination of this Agreement, including monitoring performance, coordinating reviews, arbitrating conflicts and generally overseeing the relationship between Venture and Agilent.

2.30    "Governmental Authority" means any federal, state, county, municipal, district or local government or government body, or any public administrative or regulatory agency, political subdivision, commission, board or body, or representative of any of the foregoing,

foreign or domestic, of, or established by any such government or government body that has authority in respect to a particular matter.

2.31    "Impact Proposal" means the evaluation of the effect of Venture's proposed Engineering and Manufacturing Changes on, but not limited to, the price, performance, reliability, manufacturing capacity, lead and delivery times, appearance, and Components of or related to the Products.

2.32    "Intellectual Property Rights" means all copyrights, patents or patent applications, mask registered designs or registered design applications, Marks (registered or not), Mask Works, inventions, trade secrets, proprietary technical information (including but not limited to specifications, designs, plans, computer programs in source and object code, flowcharts, diagrams, drawings and other information), and manufacturing processes, and other similar proprietary information.

2.33    "Lead Time" means the minimum time between the Order date and the date the Components or Products are shipped from Venture in accordance with the Order terms. Lead Time shall not include time in transit.

2.34    "Life-time Buy" or "LTB" means the process for purchasing discontinued Components or Products (i.e., those no longer available from Venture, a Component Supplier or any other distribution channel) to span Product Life or Support Life requirements, as applicable, for that Component or Product as described in Section 14 below.

2.35    "Lot" means a batch of the products manufactured under the same work order number at Venture.

2.36    "Manufacturing Changes" means any material design changes, geographical relocations of manufacturing processes from one facility to another, or outsourcing of the manufacturing of sub-processes.

2.37    "Marks" means the trademarks, service marks, trademark and service mark applications, trade dress, trade names, logos, insignia, symbols, designs or other marks identifying a Party or its products.

2.38    "Mask Work" means the pattern used to transfer design and technical information from the Product Requirements onto a Product or Component.

2.39    "New Product Introduction", also referred to as "NPI", means, for each Agilent Business Unit, the process to introduce a new or existing Product into Venture's manufacturing process.

2.40    "New Product Introduction Support" means, for each Agilent Business Unit, the interaction between Agilent and Venture to facilitate the introduction of new or existing Products into Venture's manufacturing process.

2.41  "Non-Conforming Products" means any Product received by Agilent or its customers that does not conform to the Product Information and/or General Technical Specifications stated in this Agreement.

2.42  "NRE" means non-recurring engineering expenses.

2.43  "Obsolete Components" means Components on-hand or on order at Venture made obsolete by Change Orders, deletion from Agilent's CPL (Customer Price List), or obsolescence by Venture under Section 13 below.

2.44  "Open Purchase Order" or "Open PO" means a written or electronic purchase order issued by Agilent to Venture for the purposes of activating and maintaining Venture as an approved vendor in Agilent's electronic purchasing and payment systems; provided, however, that no such Open PO will be considered a binding Order until Venture receives a Release. In the Oracle environment, this is called Blank Purchase Agreement, or BPA.

2.45  "Order" means a written or electronic purchase order (including any attachments thereto) issued to Venture by an Eligible Buyer containing unit quantity; unit price; shipping destination and instructions; Delivery Date; and other instructions or requirements pertinent to the Order.

2.46  "Package or Packaging" refers to the material used in the protection of Products and Components while at Venture's facility and in transit.

2.47  "Percentage Limits" means a level, percentage, or amount of Consigned Components with respect to total Component inventory at Venture.

2.48  "Placements" means the number of Components on either an individual or group of printed circuit assembly(s).

2.49  "Pre-Existing Intellectual Property" means any Intellectual Property conceived or developed prior to performance of this Agreement.

2.50  "Product Exhibit" means the list of Products to be manufactured by Venture hereunder, which will be attached to each applicable Business Unit Addendum or attached separately hereto in the absence of such addenda.

2.51  "Product Life" has the meaning set forth in Section 12.1.

2.52  "Product Life Cycle" has the meaning set forth in Section 12.1.

2.53  "Product Requirement" means any requirement for the development or manufacture of Products provided by Agilent to Venture, including all manufacturing information, technical data and manuals, design information, drawings, documentation, packaging requirements, testing requirements, Specifications, or any other criteria written and provided to Venture by Agilent.

2.54    "Products" or "Product" means those assemblies, sub-assemblies, systems, and other products manufactured by Venture hereunder identified on a Business Unit Addendum, or if absent from such addenda, is listed on a Product Exhibit to be appended to this Agreement.

2.55    "Prototype" means the pre-production unit of a Product, packaged in a production package, and manufactured in accordance with the Product Requirements with full test verification.

2.56    "Quarter" means a quarter within each Contract Year, and unless stated otherwise in this Agreement, commencing on the first day of November, February, May, and August of the Contract Year.

2.57    "Release" generally refers to electronically transmitted authorization or instructions to execute against an Order.

2.58    "Residual Component Inventory" is defined as either industry standard or Custom Material that is not returnable, re-saleable, nor readily reusable on other Products or programs.

2.59    "Scrap" is defined as any Product or Component, which fails more than three (3) repairs by Venture, or is deemed not usable and saleable pursuant to Sections 10, 11 and 12 and subject to disposition.

2.60    "SMI", also known as "Supplier Managed Inventory" means a program initiated between Venture and an Agilent Business Unit for ownership of a mutually agreed level of finished goods inventory at an Agilent location and the processes established to support Agilent's and Venture's requirements.

2.61    "Specifications" means the General Technical Specifications listed in Exhibit B, along with any other specifications as may be mutually agreed.

2.62    "Subsidiary" means an entity controlled by or under common control with a Party to this Agreement, provided that such control continues to exist. For purposes of this definition, "control" means the possession, directly or indirectly or as trustee or executor, of the possessor to direct or cause the direction of the affairs or management of an entity, whether through ownership of voting securities, as trustee or executor, by contract or otherwise, including, without limitation, the ownership, directly or indirectly, or securities having the power to elect a majority of the board of directors or similar body governing the affairs of such entity.

2.63    "Supplier Performance Expectations" means those quality standards and metrics that Venture must meet as further described in Section 15.1 and Exhibit J hereto.

2.64    "Support Life" has the meaning set forth in Section 12.1.

2.65    "Technical Assistance" refers to any technical design support given to produce a product for Agilent, including but not limited to, design feedback to Agilent for improved

manufacturability, potential reductions in cost, improved testability and improved assembly yield.

2.66    "Technical Manufacturing Information" means the manufacturing information, process and technology used by Venture or third parties under its control to design, develop, test or manufacture the Products including, but not limited to: (i) specifications, software, schematics, drawings, designs, Mask Works, Topography or other materials pertinent to the most current revision level of manufacturing of the Products; (ii) copies of all inspection, manufacturing, test and quality control procedures and any other work processes; (iii) jig, fixture and tooling designs; (iv) Venture history files; and (v) support documentation.

2.67    "Term" means initial term of this Agreement set forth in Section 1.3 above plus any additional Contract Years added to such initial term.

2.68    "Termination Inventory" means Components on order, Component inventory, work-in-process, and finished Product inventory at the discontinuance or termination of this Agreement or upon receipt of a Change Order from Agilent, or at the complete or partial termination or cancellation of an Order or of a Product.

2.69    "Test Fixtures" means electrical test equipment tooling, including software applications or programs, provided to Venture from Agilent for the purpose of testing completed printed circuit board assemblies or systems manufactured by Venture, where Agilent retains all ownership interest and obligations in such Test Fixtures.

2.70    "Test Software" means any programs or code that Venture develops to perform test verification for Prototypes, Components or finished Products.

2.71    "Tools" means equipment, jigs and fixtures that may be used by Venture in the manufacture of Products.

2.72    "Topography" means the three-dimensional pattern, fixed or encoded, formed by the metallic, insulating and semiconductor material contained in a Product or Component.

2.73    "TQRDCEb" means Agilent's Supplier Performance Expectations in the areas of technology, quality, responsiveness, delivery, cost, environment and business management as set out in Exhibit J.

2.74    "Turnkey Components" means a Component that Venture procures directly from the Component Supplier or the appropriate distributor.

2.75    "Unique Components" means those Components used only with respect to Products manufactured hereunder (i.e., custom by fit, form or function) and that are not Common Components.

2.76    "Zero Demand Components" means Components for Products that have no current demand by customers but which remain on Agilent's Customer Price List ("CPL").

## 3.0  Prototypes

3.1  <u>Prototype Services</u>.  Venture will design and develop Prototypes and Test Software for each Product and will perform the additional services set forth below or as otherwise agreed to in a Business Unit Addendum.  Prototypes will be delivered to the Agilent Business Unit responsible for that Product.

In the event a Prototype is rejected, Venture will use all available resources to remedy the problems, re-test the Prototype and resubmit the Prototype for review.  The turn-around-time for the prototype is not expected to exceed ten (10) days.  The turn around time begins when all necessary data is received at Venture and ends when the Prototype is received at Agilent's dock.  If Venture is unable to deliver an acceptable Prototype within twenty (20) days, the Parties will discuss and agree on an appropriate resolution of the matter.

3.2  <u>Return of Prototypes</u>.  Any Prototypes rejected may be returned at the option of the Agilent Business Unit Manager using the return processes set forth in <u>Sections 11.3 and 11.4</u> below or as otherwise agreed between the Agilent Business Unit Manager and the Venture Site Specific Program Manager.

## 4.0  Ownership

4.1  <u>Pre-Existing Intellectual Property</u>.  Each Party will maintain all right, title and interest in Pre-Existing Intellectual Property, subject to any licenses granted below.

4.2  <u>Developed Intellectual Property</u>.  Except as otherwise provided in <u>Section 4.3</u> below, including, without limitation, Product Requirements, Deliverables, and Developments, ownership of Intellectual Property conceived or developed under this Agreement will be owned by the Party or Parties whose employees, agents or contractors conceive, author or otherwise create such Intellectual Property.  Unless otherwise provided in a Business Unit Addendum, any Intellectual Property that may be developed jointly will be co-owned.  For such jointly owned Intellectual Property, the Parties will be bound by the terms of the Joint Invention Agreement (JIA) attached as <u>Exhibit R</u>.  To the extent any term of this Agreement conflicts with any term in the JIA, the terms of this Agreement will control and take precedence.

4.3  <u>Agilent Rights</u>.

4.3.1  Subject to Venture's rights specified in <u>Section 4.4.1</u> below, Agilent will own all right, title and interest, including all Intellectual Property Rights, in and to the Requirements and the Deliverables.

4.3.2  During the Term plus any period of support that may survive termination or expiration of this Agreement, Venture agrees to inform Agilent promptly of any Developments.  Agilent will own all Developments and Venture will assign all such rights to Agilent.  In addition Venture will execute any necessary documents and will otherwise assist Agilent, at Agilent's expense, as reasonably requested, to

protect such Developments.

4.3.3   To the extent any of Venture's Pre-Existing Intellectual Property or other Intellectual Property developed, owned, or controlled by Venture is incorporated within or used in connection with any Product (Venture Product Intellectual Property), Venture hereby grants to Agilent for use with the Product a non-exclusive, royalty-free, worldwide, transferable, perpetual license under Venture Product Intellectual Property to make, have made, sell, offer for sale, import, use, reproduce, modify, adapt, display, distribute, make other versions of, and disclose such Intellectual Property including the right to sublicense third parties (including system integrators, VARs and other resellers).

4.3.4   Upon request, Venture will grant to Agilent a non-exclusive, worldwide license under Venture's Technical Manufacturing Information unique to Products to make, have made, sell, offer for sale, import, use, reproduce, modify, adapt, display, distribute, make other versions of, and disclose Venture's Technical Manufacturing Information unique to Agilent Products so that Agilent may further develop, improve, test and support such Products.

4.4   <u>Venture Rights.</u>

4.4.1   Venture will own all right, title and interest, including all Intellectual Property Rights, in and to Intellectual Property related to Venture's manufacturing process of the Products that Venture develops solely on its own, without assistance or input from Agilent, including Venture's Technical Manufacturing Information for the Products, subject to Agilent's rights in Developments under <u>Section 4.3.2</u> above, Agilent's license of unique Technical Manufacturing Information under <u>Section 4.3.4</u> above, and Agilent's manufacturing rights under <u>Section 13</u> below.   Any Technical Manufacturing Information developed by Venture for and paid by Agilent solely for the purpose of manufacturing Agilent Products, which is unique to Agilent's Products, will be used solely for the design, development, testing and manufacturing of such Products.   Agilent agrees to maintain the confidentiality of Venture's Technical Manufacturing Information under the terms specified in <u>Section 20</u> below.

4.4.2   Agilent grants to Venture, a non-exclusive, non-transferable, worldwide, royalty-free license under Agilent's Intellectual Property Rights to use the Product Requirements to design, develop, test and manufacture the Deliverables for the term of this Agreement. Venture agrees to maintain the confidentiality of the Product Requirements under the terms specified in <u>Section 20</u> below.

4.5   <u>Trademark Usage.</u>   Nothing in this Agreement implies the grant of any license from one Party to the other to use any Marks.   Notwithstanding the foregoing, Agilent grants to Venture the non-exclusive, limited right to reproduce any designated Agilent Marks on Agilent Products.   All Agilent trademark reproductions must be approved in writing by Agilent and must be in accordance with Agilent's then current Corporate Identity Trademark booklet, a copy of which is included in <u>Exhibit B.</u>

## 5.0    Product Purchases

5.1    <u>Purchase and Sale of Products</u>.    Eligible Buyers may purchase and Venture will sell Products pursuant to the terms and conditions of this Agreement.    Venture will not sell Products pursuant to this Agreement to any other third party without the prior written approval of the Agilent Business Unit Managers, whose Agilent Business Unit is purchasing such Product.    Venture will refer non-Agilent buyers, who may desire to purchase Products under this Agreement, to the appropriate Agilent Business Unit Manager.

5.2    <u>Non-Exclusive</u>.    Nothing in this Agreement will be deemed to restrict Agilent, or any Eligible Buyer's right to manufacture Products internally or through third parties, purchase Products from other sources or enter into a similar agreement with any third party.

5.3    <u>Order Acknowledgment</u>.    Unless otherwise indicated, purchase of Products will be initiated by an issuance of an Order by Eligible Buyers to Venture.    The Order may be in the form of an Open PO.    If an Open PO is used, the Eligible Buyer will issue periodic Releases to Venture.    Such Releases against an Open PO will constitute a firm Order. Venture will notify the Eligible Buyer electronically within two (2) business day if it utilizes EDI, or if in writing, within three (3) business days of receipt of the Order, and inform the Eligible Buyer of the reason, if Venture is unable to meet any requested order requirements.    The absence of written notice constitutes acceptance of the Order and commitment to the terms of the Order.    For Orders exceeding Forecast or the amounts specified in the flexibility guidelines to the Business Unit Addendum (or as otherwise agreed between the Agilent and Venture Global Account Managers), Venture will have two (2) additional business days in which to accommodate or reject the order with respect to the excess.    If an Agilent Order exceeds the Forecast or shortens the Lead Time, Venture will use its best efforts to fill such excess or accommodate such shorter Lead Time.

5.4    <u>Forecasts</u>.    Eligible Buyers agree to provide Venture with a minimum of a 6-month rolling Forecast.    Except as expressly provided below or otherwise agreed to by the Parties in a Business Unit Addendum, Product Forecasts supplied to Venture from Eligible Buyers are provided as an accommodation for planning purposes only, and will in no way constitute a commitment on the part of an Eligible Buyer.    All Product Forecasts will be considered Confidential Information pursuant to <u>Section 20</u>.    Agilent may revise any Forecast in its sole discretion.    Subject to Section 9, Agilent authorizes Venture to procure Components where the lead-time exceeds the Product Lead Time.    Venture will build Product upon receipt of Order or Release.

5.5    <u>Duty to Fulfill Orders</u>.    Venture agrees to fulfill all accepted Orders in accordance with its terms and the terms of this Agreement prior to the termination or cancellation of this Agreement, even if the Delivery Dates of Products under such Orders occur after the date of expiration or termination.

5.6    <u>Order Allocation</u>.    If for any reason Venture is unable to meet accepted Orders, Venture will notify each affected Agilent Global Account Manager and Agilent Business Unit Manager of such failure within two (2) business days of Venture's discovery of the

problem. Venture will also provide a corrective action plan with a timetable to resolve the problem. Agilent's Global Account Manager and Agilent's Business Unit Managers may, in their discretion, determine an Order allocation prioritization plan or take such other steps they deem necessary.   Any such steps will not be deemed a waiver of any breach on the part of Venture.

5.7    Lead Time.    Standard Order Lead Time for Product under this Agreement is thirty (30) calendar days within Forecast or Order quantity pursuant to the flexibility guidelines to the Business Unit Addendum, unless otherwise agreed in a Business Unit Addendum. Venture must give the Eligible Buyer no less than thirty (30) calendar days advance notice to approve or reject any proposed increase in Lead Time.   For Orders exceeding Forecast or quantity pursuant to the flexibility guidelines, Venture will make all commercially reasonable efforts to meet the Order requirements.

5.8    Emergency Orders.   If an Eligible Buyer deems it necessary, it may order Products by EDI or facsimile on an emergency basis (Emergency Order) subject to the availability of such Products in Venture's inventory.   Venture will use its best efforts to ship the Emergency Order to the stipulated destinations within eight (8) work hours after the receipt.   The Eligible Buyer will pay any reasonable additional expenses related to such Emergency Orders.

5.9    Flexibility Guidelines.    The Parties agree to the following flexibility guidelines, unless otherwise provided in a Business Unit Addendum:

a)    A Business Unit may postpone, decrease, or cancel an Order or Release in whole or in part upon written notice to Venture. Upon receipt of a written notice of cancellation, Venture will immediately cease production and all work in progress related to the cancelled Order or Release. Venture will be entitled to be reimbursed by that Business Unit for actual costs incurred by Venture as a direct result of such postponement, decrease, or cancellation that are not recoverable by the shipment of the affected Agilent Products or associated Component to other purchasers (subject to Venture's duty to remove Agilent Marks as specified in Section 11.6 below) within a reasonable period of time or the exercise by Venture, in a commercially reasonable manner, of other mitigation measures, such as those described in Section 26.4 below.   In no event with Agilent's liability under this Section 5.9 exceed the sum of the following:  (i) costs of work in progress not exceeding Product costs and (ii) costs incurred by Venture to purchase Components within Product Forecast that are not otherwise recoverable by canceling its purchase commitments with Component Suppliers, returning such Components for credit, or using such Components for other customers, provided that Venture has demonstrated prudent procurement practices in purchasing such Components.

b)    Agilent Business Units may increase Orders or Releases by the amounts specified in the flexibility guidelines to the Business Unit Addendum (or as otherwise agreed between the Agilent and Venture Global Account Managers) with no additional increase in the Product price between price setting periods, subject to the

availability of Components and the required advance written authorization. Other Eligible Buyers will have the flexibility rights provided above if they have agreed in advance with Agilent to assume any reimbursement obligations to Venture hereunder.

c)     If an Agilent Order exceeds the agreed flexibility, Venture will use commercially reasonable efforts to fill such excess or accommodate such flexibility. Successful accommodation will be reflected positively in Venture's TQRDCEb review.

## 6.0 Delivery and Acceptance

6.1   <u>Delivery.</u> The Parties agree to use the logistics processes referenced in attached <u>Exhibit N</u>. Unless otherwise specifically provided for in a Business Unit Addendum, all Product shipments will be FCA (Shipping Dock at Venture's manufacturing facility) (INCOTERM2000) for shipments within the country of manufacture, or FCA (Port of Export) (INCOTERM2000) for international shipments. If due to Venture's failure to make a timely shipment, the specified method of transportation would not permit Venture to meet the Delivery Date, the Products affected will be shipped by air transportation or other expedient means acceptable to Agilent. Venture will pay for any resulting increase in the freight cost over that which Agilent would have been required to pay by the specified method of transportation.

6.2   <u>Title and Risk of Loss.</u> Title to and risk of loss or damage to the Product will pass to Agilent upon Venture's tender of the Product to the Agilent carrier. If and when a selected carrier is not Agilent specified, Venture will assume all risk of loss or damage during transport.

6.3   <u>Acceptance.</u> Where specific Acceptance Criteria and procedures have been agreed between the parties, these will be contained under a Business Unit Addendum and Acceptance of the Product will occur no later than seven (7) calendar days after receipt of Product or as mutually agreed between the parties and will be based solely on whether the Product passes the acceptance test procedure or inspection procedure required under the Business Unit Addendum or as instituted by the Agilent Global Account Manager. Any acceptance tests or inspection procedures will be designed to demonstrate compliance with the Product Requirements. Products will be deemed accepted if not rejected within this seven (7) day period after delivery or as mutually agreed between the parties.

6.4   <u>Early Shipment and Over Shipment.</u> Unless otherwise agreed by the Parties in a Business Unit Addendum, Venture will not deliver Product more than three (3) days in advance of the Delivery date specified in the Order, nor will Venture deliver more Product than the quantity specified in the Order. In the event of early or over shipment, Agilent may, at its sole discretion, either return or retain the Products delivered earlier or in greater quantity than specified in the Order. If the Products are returned, the return will be in accordance with <u>Sections 11.3 and 11.4</u>. If Agilent elects to retain the Products, Agilent will not issue payment for the early and additional Products until such time that payment would have been due if Product Orders had been properly fulfilled.

6.5    <u>Rejected Products</u>.    Prior to returning any rejected Product, Agilent will obtain a Return Material Authorization ("RMA") number from Venture, and will return such Product in accordance with Venture's instructions.    Agilent will specify the reason for such rejection in all RMAs.    In the event a Product is rejected, Venture will promptly take corrective action to cure any defect that led to the rejection.    If the Product again fails the acceptance test or inspection procedure, Venture will, at Agilent's option, replace the Product or refund the purchase price.    Once a Product is accepted, all Product returns must be handled in accordance with <u>Articles 10 and 11</u> below.

## 7.0    Prices and Payment Terms

7.1    <u>Agilent Product Pricing</u>.    Specific Product prices, currency and any exchange rate sharing will be agreed upon by Venture and Agilent and set forth either in the applicable Business Unit Addendum or Product Exhibit to this Agreement.    Unless otherwise agreed in a Business Unit Addendum, the Parties agree to use the pricing models described in <u>Exhibit G</u>.    Prices will also be subject to any available prompt payment discounts that Venture may, at its discretion, offer to its customers.    Venture and Agilent agree to review and implement adjustments to Product and Component prices on at least a semi-annual basis as specified in <u>Exhibit F</u>.

7.2    <u>Adjusted Pricing</u>.    The Parties agree to implement the following pricing methodology to implement new pricing or price adjustments, whether for a new product or existing Products. To introduce new pricing, Venture will issue a quotation to Agilent listing the Product and pricing for each assembly of the Product.    To indicate Agilent's acceptance of the pricing on Venture's quotation, Agilent will issue new Orders as needed, or revise its existing Orders to reflect the new pricing in Venture's quotation.

7.3    <u>Payment Terms</u>.    Unless otherwise indicated below or as agreed to under a Business Unit Addendum, Agilent and Venture agree to payment terms of net thirty-five (35) days for Eligible Buyers within the U.S. and net thirty (30) days for Eligible Buyers located outside the U.S. from the later of invoice or receipt by Agilent of the Products or the Delivery Date, (except as provided in <u>Section 6.4</u> above).    Payment will be made in the currency stated in Business Unit Addendum or Order, as applicable.    No payment otherwise due with respect to any Product will be payable to Venture until the Product has been accepted in writing by the Eligible Buyer or that Eligible Buyer fails to reject the Product within the designated testing and inspection period.    In the context of a Buy/Sell situation where Venture buys Components from Agilent, the above payment terms shall apply with respects to payment from Venture to Agilent.

7.4    <u>Additional Charges and Expenses</u>.    Venture will separately list on its invoices the following charges and expenses, unless Agilent has paid for such charges or expenses directly or has provided Venture with proper evidence of its exemption from such charge: (i) freight (outbound), export licensing of the Product, or payment of broker's fees, duties, tariffs, or other similar charges; (ii) taxes or charges (other than those based on Venture's net income or any other taxes or charges not directly related to the manufacture sale,

shipment, storage, "value add" or use of Products to Agilent) imposed by any taxing authority upon the manufacture, sale, shipment, storage, "value add" or use of the Product that Venture is obligated to pay or collect; (iii) cost of compliance with any environmental legislation relating to the return or disposal of Products at the end of Product Life if Venture is required to comply with such environmental legislation; and, (iv) agreed to set-up, tooling, or non-recurring engineering activities (collectively "NRE Charges").

7.5     Most Favored Purchaser Warranty.   If Venture offers a better price or price formula to any third party for similar products, based on similar volumes, Venture agrees to offer such price or price formula to Agilent retroactively as of the date first offered to the third party. Venture agrees to fulfill its obligations in this Section in good faith and further agrees that it will not create any purchasing programs, pricing formulas or other conditions that serve to deny Agilent the benefits of its favored purchaser status. In addition, Agilent may credit any amounts due under this Agreement against future invoices.

7.6     Changed Prices.   If, during the Term, changed prices or price formulas are put in effect by mutual agreement of Agilent and Venture, such prices or price formulas will apply to all open Orders issued by Agilent and accepted by Venture per Section 5.3 that exist at the time of the effective date of such prices or price formulas and all new accepted Orders after the effective date of such prices or price formulas.

7.7     Cost Breakdown.   At Agilent's request, Venture agrees to utilize the format outlined in Exhibit C to respond to Agilent's requests for quotation on new or additional Products or for any other pricing submissions made to Agilent (e.g., Product revision pricing submittals). Upon reasonable request, Venture agrees to furnish Agilent with a fully-costed Bill of Material and fully detailed Assembly Lead-times for each Product quoted.   All quotations by Venture are considered the confidential information of Venture.

7.8     Electronic Pricing Submittals.   Upon request, Venture will provide pricing submittals electronically using the request for quote models outlined in Exhibit C attached hereto. The Parties will agree to an electronic method to be used for such submissions.

## 8.0   Cost Management

8.1     Cost Management Process.   Agilent will document and append to Exhibit G a mutually acceptable process to manage cost variances due to significant changes, such as Engineering or Manufacturing Changes, Component changes, Agilent approved AVL changes, or any other substantially significant change.

8.2     Total Cost of Ownership.   Agilent and Venture agree to pursue cost reduction improvements throughout the supply chain (not limited to Component cost).   An annual stretch goal of 10% total cost reduction (not necessarily Product cost reduction) is the objective, to be achieved by investigating and improving total supply chain practice; including but not limited to procurement practices with Component Suppliers, logistics, and service providers.   Venture will make all commercially reasonable efforts to achieve the goal for total cost reduction, but is not legally obligated to provide Agilent a 10% Product cost reduction per year.

8.3 <u>Cost Reduction Sharing</u>.  Venture agrees to share any cost savings achieved equally with Agilent for a period of twelve (12) months and thereafter pass through all such savings to Agilent.  Product prices will be amended accordingly.  Venture will demonstrate cost reduction improvements and report such results to the appropriate Agilent Business Unit Manager at a minimum quarterly, unless otherwise indicated in the Business Unit Addendum.

8.4 <u>Cost Model Details</u>.  For the purpose of continuous cost reduction and cost management, Venture will provide upon request (at any time during or after the Product quotation process) additional cost model details, including assembly, test, packaging, NRE and cost of acquisition.

## 9.0  Component Procurement

9.1 <u>Approved Vendor Lists</u>.  Venture is authorized to procure Components (including Turnkey Components) to meet Agilent Forecasts.  Venture agrees to buy all Components from suppliers on the AVL.  Use of "brokers" for Components will require specific approval by Agilent, which approval will not be unreasonably withheld, prior to use by Venture. In the event that Venture is unable to procure a Component(s) as a result of the AVL restrictions set forth herein, Agilent and Venture agree to negotiate changes to the AVL. Venture will use a prudent standard purchasing practices, such as, but not limited to, 'ABC' buying policy, long lead-time Component management, minimum and multiple supplier order quantities and SMI programs in order to meet Agilent Forecasts.

9.2 <u>Usage Requirements</u>.  All Components or other materials parts ordered for any Products are to be used to manufacture Products only.  Any other use or substitution of Components or materials must have Agilent's prior written consent.  Venture is expected to follow prudent practices to ensure acceptable Agilent demand flexibility and assurance of supply while minimizing total inventory exposure, including use of Supplier Managed Inventory or similar methodologies.  In the event that prudent and normal procurement practices are not evident as defined above, in the event of excess due to cancellation, termination or demand reductions, Agilent will not be liable for that portion of the material purchased in excess of the amount that would have been purchased if such procurement practices had been used.

9.3 <u>Component Shortages</u>.  Venture agrees to provide appropriate support to ensure supply of all Components or families of Components (affecting Products) that may be in limited supply.  In the event of a probable or potential Component shortage or availability problem that may impact assurance of supply, Venture will immediately escalate the situation to the affected Eligible Buyer(s).

9.4 <u>Purchasing Components from Agilent Contracts</u>.  Venture may procure Components through use of existing Agilent purchase agreements with Component Suppliers.  Under such circumstances, the Components may be procured by an Agilent authorized representative and then transferred or resold to Venture pursuant to the Buy/Sell procedure described below.  Alternatively, Agilent (or an Agilent Business Unit Manager for contracts negotiated between the supplier and that particular Agilent Business Unit) may

seek authorization for Venture to purchase the Components directly from the Component Supplier under the terms of that Agilent purchase agreement. In such case, any such purchase must be at the price quoted by the Component Supplier, refer to and use the specific Agilent Part Numbers involved and must be used exclusively for Venture's performance under this Agreement.

9.5 <u>Component Forecasts from Venture to Suppliers</u>. Venture will provide to Agilent's AVL Component suppliers on a monthly basis a rolling twelve (12) month forecast of all Turnkey Component requirements or such forecast as may be mutually agreed between the parties and consistent with Agilent's forecast to Venture. This Component forecast will be updated at least monthly for all planned orders in accordance with a mutually agreeable Component forecast implementation plan documented in <u>Exhibit I</u>. A copy of the forecast will simultaneously be provided to Agilent.

9.6 <u>Component Forecasts from Venture to Agilent</u>. Venture will provide to Agilent on a bi-monthly basis a rolling twelve (12) month forecast, or such forecast as may be mutually agreed between the parties and consistent with Agilent's forecast to Venture, of all Buy/Sell Component requirements in accordance with a mutually agreeable Component forecast implementation plan documented in <u>Exhibit I</u>. In turn, Agilent will provide a written acknowledgement of all Buy/Sell Components needed within five (5) business days.

9.7 <u>Use of Agilent Part Number</u>. For the purposes of Component forecasts, Orders and materials or inventory management reporting, Agilent's Component part number will take precedence over manufacturer's or a Venture's part number for all Products. In addition, Agilent's part numbers and supplier numbers will be reflected in all reports of Component forecasts.

9.8 <u>Purchase of Agilent Component Inventory (Buy/Sell)</u>. For the purposes of ongoing manufacturing, short-term requirements and the manufacturing of new Products, Venture recognizes that Component material may need to be acquired from Agilent inventories. Venture and Agilent agree to the following terms and conditions for the following categories of Buy/Sell Components:

    a) <u>Permanent Buy/Sell</u>: Venture will provide Agilent a forecast for these Components as defined in <u>Section 9.6</u> above. Agilent will determine the list and the standard cost of the Components to be transferred to Venture. If needed, Agilent may elect to request in writing that a Permanent Buy/Sell Component or a batch of a Permanent Buy/Sell Component shipment should be stored separately or used to manufacture a specific Order or a Product by Venture.

    b) <u>Shortage Pull</u>: Venture will submit a list of Components to be acquired from Agilent's inventory. Agilent must respond to Venture's request within 24 hours with details as to availability and date of delivery to Venture. Agilent will utilize Venture's standard cost when accounting for the transfer of ownership of these Components to Venture.

c)   Seeding Buy/Sell: Agilent and Venture will agree to in writing to the terms and conditions that will govern the transfer of Component inventory to Venture for the purpose of the manufacture of new Product. Agilent will determine the standard cost of the material to be transferred to Venture.

9.9   Purchase Terms.   Venture will purchase the Buy/Sell Components from Agilent under Agilent's standard terms and conditions of sale as documented or referenced in Venture's Purchase Order.   Any such terms will be made a part of this Agreement and incorporated herein.

9.10   Consigned Components.   Agilent reserves the right to supply through consignment, at its discretion, any Components to Venture related to the production of Product.   Agilent will retain all rights, title, interest, and obligation (including but not limited to, warranty related issues) in the Components furnished to Venture as consigned inventory.   Agilent will retain ownership of all such Consigned Components including during the time such Components are used by Venture in the manufacturing of Agilent's Products.   Percentage Limits on the Consigned Components will be mutually agreed upon by the parties in the Agilent Business Unit Addendum.

9.11   Return of Consigned Components.   Venture will return, at Agilent's cost, all consigned Components upon written request from Agilent.   If Venture fails to identify and return any Components within a timeline agreed upon by the parties, Venture will be obligated to buy the Consigned Components from Agilent at Agilent's purchase price,   The Consigned Components will be returned to Agilent in accordance with the written instructions provided by the Agilent Eligible Buyer.

9.12   Component Price Auditing.   Venture will regularly, or upon reasonable request by Agilent Global Accounts, provide a fully costed BOM report of Component pricing quoted to Agilent for Products supplied.   This information will be treated as Confidential and access to it shall be restricted to those Agilent employees who have a need to know, such as the Agilent Global Account Manager.

## 10.0 Warranties

10.1   Product Warranty.   Venture warrants that all Products will:

a)   Be new or newly manufactured, include new Components, processed and/or assembled by Venture unless otherwise agreed to in writing by the Parties;

b)   Conform strictly to the Product Requirements (including those Specifications listed in Exhibit B), and other criteria referred to in this Agreement;

c)   Comply with all applicable regulations of Governmental Authorities and certifications (as detailed in the Product Requirements) as they apply to the manufacture of the Products;

d)   Be free and clear of all Encumbrances and other claims to title or ownership;

e)   Be free from defects in workmanship as specified in the Agilent Acceptability

Specification 930.610, as listed in <u>Exhibit B</u>; and

f)  Not violate or infringe any third party Intellectual Property Rights solely with respect to Venture's manufacturing processes and Venture further warrants that it is not aware of any facts upon which such claim could be made. If Venture learns of any claim or any facts upon which a claim could be made, it will promptly notify Agilent of this information.

10.2  <u>Components Warranty</u>.    Venture will pass on to Agilent all Component Suppliers' warranties to the extent that they are transferable.    Venture agrees to ensure that all Components used in the Product are manufactured by suppliers on Agilent's AVL.

10.3  <u>No Impediment</u>. Venture warrants that, at the time of execution of this Agreement, there is no pending or threatened legal action or proceeding by or against it that may have a material adverse effect on its ability to fulfill its obligations under this Agreement. Venture further warrants that it will notify Agilent in writing immediately upon becoming aware of any such action or proceeding.

10.4  <u>Survival of Warranties</u>.    Product Warranties will survive any inspection, delivery, acceptance or payment by Agilent and be in effect for a three (3) year period following the date of shipment of the Product to an Eligible Buyer (the "Warranty Period").    Should there be a breach of any of the Warranties specified during the three (3) year period, Venture will, at its option and its expense, repair, replace, or if repair or replacement is not possible issue a credit for Product found defective during the Warranty Period, which credit shall not exceed the cost of the Product. On Product transferred out of Venture to a 3rd party, Venture agrees to pay reasonable fees for repairs, not to exceed the cost of the Product.    The warranties do not cover Products damaged by accident, abuse, neglect or improper handling by anyone other than Venture or its agents.    Warranties provided by Venture cover only (i) Venture work and materials, (ii) components still under warranty, and (iii) where any defect, damage or liability is caused by Venture's act, default or negligence.    Venture shall use its commercial best efforts to obtain a three (3) year warranty from its Component Suppliers for all components used in the manufacture of Agilent Products.

10.5  <u>DISCLAIMER</u>.    THIS WARRANTY IS IN LIEU OF ANY OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, REGARDING ANY PRODUCTS, OR REGARDING THEIR MERCHANTABILITY OR THEIR FITNESS FOR ANY PARTICULAR PURPOSE.

## 11.0  Return of Non-Conforming Products

11.1  <u>Non-Conforming Product.</u>  Agilent may return for repair or replacement an entire Lot of Products if a tested sample of that lot contains Non-Conforming Products exceeding an Acceptable Quality Level ("AQL") of one percent (1%).

11.2  <u>Repair Period.</u>  Unless otherwise specified in Business Unit or Product Addenda, Venture will return the replacement or repaired Products as soon as possible but in no event later

than ten (10) calendar days after receipt of the Non-Conforming Product from Agilent.

11.3    Return Material Authorization.  Prior to returning any rejected Product, Agilent will make a written request for a Return Material Authorization ("RMA") number from Venture, and will return such Product in accordance with the provisions of this Section or other provisions if mutually agreed to by the parties in writing and made a part of this Agreement.  For Non-Conforming Products, Agilent will notify Venture in writing of identified Non-Conforming Products within an average of fifteen (15) days and no greater than thirty (30) days, in any case, of the discovery and completion of analysis of such Products.  Agilent will specify the reason for the return in the RMA authorization request. In the event a Product is rejected, Venture will promptly take corrective action to cure any defect that led to the rejection.  If the Product again fails the acceptance test or inspection procedure, Venture will, at Agilent's option, replace the Product or refund the purchase price.  The billing process for Agilent Product returns is provided in Exhibit E. Parties shall address "No-Trouble Found" issues in a Business Unit Addendum.

11.4    Return Process.  All Non-Conforming Products returned by Agilent to Venture, and all replacement or repaired Products shipped by Venture to Agilent to replace Non-Conforming Products, will be at Venture's expense, including transportation charges (round trip charges for replacement or repaired Products).    Title to returned Non-Conforming Products will pass to Venture upon delivery.  Venture will bear all risk of loss or damage to such Products while in transit.

11.5    Line-Down Condition.  Venture will replace all Non-Conforming Products as specified above except in those instances where Non-Conforming Product results in a line-down condition for Agilent.  In the case of a "line down condition" where an entire Agilent Product line cannot ship due to a problem solely caused by Venture, Venture will provide required resources and escalation as needed to accelerate replacement or repair.  The Parties' Global Account Managers will agree upon the accelerated delivery methods and time period. Any accelerated replacement, repair and delivery will be at Venture's expense.

11.6    Duty to Remove Marks.  Venture will remove from all Products and Components rejected, returned or not purchased, Agilent's Marks, prior to any other sale, use or disposition (excluding resale to another Agilent Business Unit) of such Products and Components by Venture.  Nothing in this Agreement gives either Party a right to use the other Party's Marks or refer to this Agreement directly or indirectly, in connection with marketing activities of any kind without the other Party's prior written consent.

## 12.0  Product Support

12.1    Product Life and Support Life.  The "Product Life" is the period beginning on the date of the first shipment of Product from Venture, including NPI activities, and continuing to the date when the Product is deleted from the Agilent Corporate Price List ("CPL").    The "Support Life" is the five (5) year period beginning on the date the Product is deleted from the CPL.

12.2    Venture Technical Support Obligation.  During the Product Life and Support Life, Venture

will maintain technical expertise on Products consistent with services provided immediately upon the Effective Date, including, but not limited to: trained personnel with sufficient training to be able to repair the Products; Venture single point of support contact for Agilent; Tools and equipment needed for the repair of Product; and ready access to historical and most current manufacturing documents. Fees for Venture technical support will be listed in the Business Unit Addendum or otherwise agreed to by the Parties' Global Account Managers. Venture's support obligation shall be limited to what is expressly provided in this sub-section unless provided otherwise in a Business Unit Addendum.

12.3    Product Support Documentation.    Venture will use commercially reasonable efforts to review Agilent documentation for accuracy, and provide feedback to Agilent if necessary. Venture will make a reasonable effort to ensure completeness and accuracy of all documentation provided by Agilent, and notifies the appropriate Agilent Business Unit when and if, any errors are found.

12.4    Class Failures.    Under any of the following "Class Failure" circumstances, the particulars of which shall be agreed between the parties and specified in a Business Unit Addendum, Agilent will have the right to call for a joint engineering assessment meeting between Agilent and Venture to investigate and assess the severity of the situation:

12.4.1    The specified number of failures in any one shift's production due to a Component or assembly process;

12.4.2    A Component, assembly or design that fails the specified Acceptable Quality Level;

12.4.3    A Product failure due to a particular part or assembly process that causes the annualized failure rate to exceed the specified rate;

12.4.4    A part or assembly process problem that contributes to more than the specified rate of non-functioning Products upon end-user customers' first receipt;

12.4.5    Any engineering or reliability test (i.e. life test, shock and vibration test) that results in one or more failures in every seven units tested or not meeting the specified confidence test level;

12.4.6    A breach of the specified safety requirements; or

12.4.7    Any other event(s) that is classified as a Class Failure and specified in the Business Unit Addendum

12.5    Class Failure Remedy.

12.5.1    In the event Agilent Products should develop a Class Failure, Venture and Agilent will cooperate and use joint resources to find a solution to remedy the problem. When a solution is achieved, Venture will incorporate the solution for all future Agilent Products manufactured and delivered to Agilent. In the event a solution cannot be agreed within fifteen (15) calendar days from the date the Class Failure was discovered or if, in Agilent's reasonable opinion, a solution cannot be

promptly implemented through an installed base upgrade or retrofit, Agilent may elect to withdraw or recall such defective products from its customer base.

12.5.2 <u>Class Failure Costs</u>.    If the cause of the failure is based on both parties' contributions to the manufacture of the Agilent Products, the parties will allocate the costs of remedy in good faith in an equitable manner.   If no equitable solution is determined, the parties will escalate the matter pursuant to <u>Section 30.12</u> below, with Class Failure costs to be allocated based on such parties' assessment of fault. Venture will reimburse Agilent for its costs in performing such service, within thirty five (35) calendar days after receiving an invoice from Agilent.   Where one Party is responsible for the failure, costs including but not limited to materials, labor, shipment and inventory replacement arising from a Class Failure (but excluding loss of profits and consequential damages) will be borne by the responsible Party depending on whether the cause is due to Product Requirements or Venture Deliverables.

12.5.3 In addition, in the event of a Class Failure, Agilent may return to Venture all in-warranty Products, at Venture's sole expense, distributed prior to the incorporation of the Class Failure solution.   If the returned Products are within three (3) years of the Product's shipment date, Venture will, at its option and its expense, repair or replace the Product as provided under the warranty provisions of <u>Section 10.0</u> above. If repair or replacement is not possible, Venture will issue a credit for the returned Products that are within this period.

## 13.0  Obsolescence And Manufacturing Rights

13.1    <u>Lifetime Buy Rights</u>.    Venture acknowledges its obligation to manufacture, supply and support the Products without interruption.   If, however, after the first year of shipment of such products, Venture seeks to discontinue the supply or support of any Product (a "Discontinued Product"), Venture will give notice to Agilent no less than twelve (12) months in advance of the last date the Discontinued Product can be ordered.   After receipt of notice of discontinuance, Agilent may, at its option:

13.1.1 Continue to place Orders for the remaining 12-month period prior to discontinuance;

13.1.2 At the end of the 12 month period, purchase from Venture such quantity of the Discontinued Product as Agilent deems necessary for its future requirements with scheduled deliveries over the next six (6) month period, subject to Component availability and Component Lead Time and Venture's obligation to make all commercially reasonable efforts to meet Agilent's requirements; and

13.1.3 Manufacture the Discontinued Product under the manufacturing rights granted in <u>Section 13.2</u> below, without payment to Venture of any royalties or other charges.

13.2    <u>Agilent's Right To Tools and/or Documents.</u>  If Venture seeks to discontinue the supply or support of a Product under <u>Section 13.1</u>, Venture will provide to Agilent the items specified in <u>Section 26.5</u> below regarding Agilent's rights upon termination.   In addition,

Venture will release to Agilent any documentation created by Venture specifically for the manufacturing of the Product within ten (10) calendar days of Agilent's written request, Agilent will keep all such documentation confidential in accordance with the terms of Section 20. If Venture refuses to cooperate with its obligations under this Section 13, Agilent may charge Venture for all reasonable costs to procure or prepare the documentation. Upon request, Agilent will provide Venture with supporting documentation for such costs.

13.2.1 Venture will furnish to Agilent all Agilent owned Tools within a mutually agreed upon timeline after Venture has received Agilent's written notification to Venture of Agilent's exercise of its rights under this Section 13.2. Agilent will pay the shipping cost. If the Agilent owned Tools are not delivered within agreed to time period, Venture will permit Agilent to enter upon Venture's premises to take possession of, assemble and collect such Tools or render them unusable, or Agilent may require Venture to assemble such Tools and make them available at a place Agilent designates in writing to allow Agilent to take possession or dispose of such Tools. Venture will also furnish to Agilent the names and addresses for sources for such Agilent owned Tools.

13.2.2 To the extent not proscribed by non-disclosure agreements between Venture and its vendors, Venture will furnish to Agilent within seven (7) calendar days after Agilent's written request, the names and addresses of Venture's sources for Components or materials not manufactured by Venture, including the appropriate part numbers for commercially available equivalents of electronic parts. Venture will use all reasonable efforts to assist Agilent in procuring the right to purchase all such components or materials directly from Venture's vendors.

13.2.3 Venture will furnish to Agilent without charge all Agilent documentation including parts catalogues, schematics, material lists, Engineering or Manufacturing Changes, Change Orders, and other servicing documentation deemed necessary by Agilent to service and support the Discontinued Product.

13.2.4 To the extent permitted, Venture will assign to Agilent any license rights it may have with third parties for software, documentation, or any intellectual property used in the manufacture of the Discontinued Product.

13.3    Consulting Services. Upon Agilent's request, Venture will provide to Agilent:

13.3.1 Up to forty (40) hours of consulting services per Discontinued Product, as required by Agilent, provided that Agilent bears the cost of reasonable travel expenses; and

13.3.2 Additional consulting services will be provided at the unit prices documented in Venture Service Matrix to be agreed between the Parties or applicable Business Unit Addendum or, if there are no applicable unit prices documented therein, at a fee mutually agreed to in writing by the Parties' Global Account Managers or Business Unit Managers as appropriate.

## 14.0  Inventory Management

14.1  <u>Inventory Reporting</u>.   Venture agrees to provide to Agilent a consolidated listing of all material inventories utilizing the reporting requirements guidelines set forth in <u>Exhibit H.</u>

14.2  <u>Management of Allocated Components</u> Except for Components supplied by Agilent or for which Agilent takes specific responsibility under a Business Unit Addendum, Venture will be responsible for managing Component allocations in the supply chain; provided, however, that within Agilent's Product allocation, Agilent retains the right to designate where the allocated Components are to be used.   As part of this responsibility, Venture will furnish the specified quantity of Products to Agilent on the designated Delivery Date and at the appropriate quality level.   Agilent Business Unit Managers and Venture may include additional allocation methods to be used in the manufacture or design of the Product in the Business Unit Addendum.

14.3  <u>Excess Components Inventory</u>.   Agilent will use its best efforts to consume the Excess Components within one year of identification.   For all Excess Components, Agilent has the option of: (i) purchasing the Excess Components from Venture, at Venture's current quoted price and consigning such Excess Components to Venture; (ii) purchasing the Excess Components from Venture, at Venture's current quoted price and having the Excess Components returned to Agilent; (iii) scrapping and disposing of the Excess Components at Venture's current quoted price; or (iv) storing the Excess Components at Venture at a monthly carrying charge described in <u>Exhibit O.</u>

14.4  <u>Obsolete Component Inventory</u>.   Obsolete Components will be communicated to the Agilent Global Account Manager or as appropriate to the Business Unit Managers as part of the monthly Obsolete Component reporting or as soon as possible after forecasted demand is removed. Venture will exercise reasonable efforts to provide such report to Agilent by the last business day of the first full week of each month.   For Obsolete Components inventory, provided that Venture has demonstrated prudent procurement practices in purchasing such Components, Agilent has the option of: (i) purchasing the Obsolete Components from Venture, at Venture's current quoted price and having the Obsolete Components returned to Agilent, or a location indicated by Agilent; (ii) authorizing Venture to sell Obsolete Components internally or externally and Agilent, upon review and agreement, pays the difference between Venture's current quoted price and selling price; or (iii) scrapping and disposing of the Obsolete Components at Venture's current quoted price. Upon Agilent's receipt of Venture's Obsolete Component report, Agilent will advise Venture in writing within thirty (30) calendar days which option Agilent has selected to disposition the Obsolete Components.

14.5  <u>Component Discontinuances</u>.   If Venture receives notice from a Component supplier or Agilent that a Component will be discontinued, Venture will notify Agilent in writing within 24 hours and will use its best efforts to identify a form, fit and function replacement and in a reasonable period of time, notify Agilent by submitting in writing a list of alternatives. The Agilent Global Account Manager or, as appropriate, the Business Unit Managers and Venture will develop an appropriate action plan, including all sample

requirements, product qualifications, updates to the AVL, and schedule changes necessary to reaching a mutually agreeable resolution of the discontinuance. Additionally, upon Agilent's request, Venture will disclose the agreements in place regarding discontinuance notification for all Turnkey Component Suppliers. Venture will make all commercially reasonable efforts to ensure all such suppliers are obligated to provide a minimum of six (6) months notification of any potential discontinuance to Venture.

14.6 <u>Component Lifetime Buys</u>. In the event that Agilent cannot identify a form, fit and function replacement, or does not approve a replacement identified by Venture, Agilent may purchase the LTB inventory and consign or Buy/Sell such LTB inventory to Venture for use in manufacturing Products. At its discretion, Agilent may also have Venture purchase the LTB inventory. Agilent will pay any costs associated with the storage or handling of such consigned LTB inventory to Venture, and Venture will determine the most appropriate allocation of such inventory among its manufacturing locations. The Parties' Global Account Managers, or Business Unit Managers as appropriate, agree to negotiate in good faith the terms of the allocation of such LTB including associated costs, adhering to the LTB Component Allocation Requirements set forth in <u>Exhibit P</u> attached hereto or as otherwise agreed in the appropriate Business Unit Addendum. Any such LTB Component Allocation agreement will be appended to <u>Exhibit P</u>, made a part of this Agreement, and incorporated herein consistent with other exhibits to this Agreement. In addition, Venture agrees to provide a Discontinuance/LTB Report to Agilent as required under <u>Exhibit H</u> and any Business Unit Addendum.

14.7 <u>Supplier Managed Inventory.</u> Where requested by Agilent, Venture and Agilent will jointly implement Agilent's regional inventory optimization programs such as, but not limited to, a Supplier Managed Inventory Program ("SMI") in a mutually agreeable time frame. Any such 'SMI' will be specified in a Business Unit Addendum. A sample format of the SMI is contained in <u>Exhibit B</u>.

14.8 <u>Inventory Valuation.</u> Venture agrees to comply with the inventory valuation requirements and processes set forth in Business Unit Addendum.

14.9 <u>Inventory Transfers to Venture.</u> In the event an Agilent Business Unit adds additional Products to this Agreement, Venture and that Agilent Business Unit will enter into an Inventory Transfer Agreement that will be included within and become a part of the applicable Business Unit Addendum. A form of Inventory Transfer Agreement is appended to the attached Business Unit Addendum Exhibit. The ITA will establish, among other things, the purchase terms, quantities, delivery, storage, and other obligations of the Parties with respect to the inventory transfer, including Bridge Buys.

## 15.0 Performance Expectations and Quality Standards

15.1 <u>Continuous Improvement Objectives</u>. Agilent and Venture agree to work together to develop and achieve the Supplier Performance Expectations as outlined in the TQRDCEb example attached hereto as <u>Exhibit J</u>. Both Parties will meet on at least an annual basis to review the progress made on the stated performance objectives. Venture is expected to maintain a minimum overall score of three (3.0) on a scale of zero to four (0-4) with no

individual attribute below two (2.0).  Venture agrees to establish and implement corrective action plans as necessary to correct any deficient score no later than three (3) months from the date that the review results are communicated to Venture by Agilent.  Venture agrees to discuss and document in the performance review meetings any productivity improvement accomplishments and future plans relating thereto.

15.2    Quality Standards.  Venture agrees to meet the quality standards and performance metrics set forth in Exhibits B and J to this Agreement.

15.3    Process Improvement.  Venture agrees to provide Agilent with Quarterly information on process improvements.  Venture will maintain an acceptable documented quality system (e.g., ISO 9002 certified quality program or equivalent) at each authorized Venture site specified in Exhibit K to manufacture Products and any additional quality requirements agreed by Venture and Agilent as specified in a Business Unit Addendum.  Venture's program will include monitoring the manufacturing processes, statistical process control, corrective action analysis of returned Product and repairs, define failure modes, improving materials and procurement processes, component traceability for critical Components, and implementation of corrective actions.

15.4    Reporting Requirements.  The Parties will mutually agree on those reports required using the Reporting Requirements Guideline in Exhibit H.  Agilent Business Unit Managers may make appropriate modifications for their particular Agilent Business Unit.  Any reports provided to Agilent pursuant to this Section will be subject to the provisions of the Confidential Disclosure Agreement attached as Exhibit D to this Agreement.

15.5    ESD Audits.   Venture agrees that Agilent may, at least once per year, enter into its manufacturing facility to conduct ESD audits.  Such audits will use the industry standards in the ANSI/ESD, Document No. S-20.20-1999, which is attached as part of Exhibit B, as the basis for these reviews.  Deficiencies identified in the ESD audit relating to conditions existing as of the Effective Date will be waived.   Such audits will be conducted in accordance with Section 15.6 below.  Venture further agrees to conduct audits as required by the ANSI/ESD industry standard noted, at all locations which manufacture Product or store materials for Agilent (using Appendix E of Drawing No. A-5951-1589-1, Revision H), and make such reports available to Agilent upon Agilent's written request.

15.6    Process Quality Problems.  Venture will properly monitor, identify and provide immediate notification to Agilent of Component and Products, or process quality problems that impact Products or Delivery Dates.   Venture will remedy such issues that are attributable to Venture, as required to effect a full and complete corrective action.  In all other cases, Venture will assist Agilent in defining an action plan for corrective action.

15.7    Inspection.   Agilent will have the right to inspect and audit, at Agilent's expense, Venture's plant, purchasing processes, manufacturing processes, quality program and supporting documentation, including reports, quality test data, training documents and certificates of conformance, and third party audit results, for the Products at any time during the Term of this Agreement, provided such audit is in accordance with Venture's security procedure, occurs during normal business hours, and does not unduly interfere

with Venture's operations.  Though all efforts will be made to minimize the frequency of audits by Agilent or an Agilent authorized audit firm, in the case of an identified quality issue, Agilent will have the right to inspect within twenty-four hours (24 hr) written notice to Venture's facility and to review applicable documentation and processes.   Normal written notification for audits will be seven (7) calendar days minimum prior to arrival. Venture will provide, at no charge to Agilent, access to such facilities and services as are `reasonably required by Agilent in performing such inspection.  All information gathered by Agilent during such audits will be subject to the confidentiality obligations under Section 20.

## 16.0  Change Notification

16.1    Venture Proposed Changes.  No Engineering or Manufacturing Changes may be made to, or incorporated into, Products without the prior written approval of the Agilent Global Account Manager and the responsible Agilent Business Unit Manager.   Venture will provide Agilent advance written notice of any proposed Engineering or Manufacturing Changes and provide evaluation samples and other appropriate information as may be specified by the Agilent Global Account Manager or by a Business Unit Manager.  Such information may include possible effects on price, performance, reliability, manufacturing capacity, lead and delivery times, or appearance, and any Obsolete Components (an "Impact Proposal").   The Agilent Global Account Manager and the affected Agilent Business Unit Managers must provide written approval of the Impact Proposal prior to any implementation of the Engineering or Manufacturing Change.

16.2    Agilent Proposed Changes.  Venture acknowledges that Agilent may need to change the Product or processes during the Term for contractual, engineering or Product related reasons. These changes will be communicated through a Changed Order (CO) request. Venture is only to take action when given change instructions in writing from Agilent. After receipt of the CO, Venture will provide to Agilent within two (2) business days an acknowledgement of the CO, and promptly thereafter provide an Impact Proposal describing, any delivery impact, an implementation date, potential scrap or material exposure and the impact on the cost of the Product due to CO changes.  If the Impact Proposal is acceptable, Agilent will notify the Venture Global Account Manager and provide specific instructions to Venture on CO implementations.

16.3    Financial Responsibility from Proposed Changes.  If Agilent accepts Venture's Impact Proposal, Agilent will assume liability for any material made obsolete due to a CO implementation per the terms and conditions described in Section 14.4 of this Agreement. In addition, Agilent will be responsible for increased labor or material charges and any reasonable rework or expedite charges for labor, materials and test resulting from a CO. Notwithstanding the above, Venture will be responsible for expenses caused by failure to implement an acknowledged CO per the warranty provisions specified in Section 10.

16.4    Change Monitoring and Tracking.  Upon implementation of an Agilent approved change to a Product under this Section, Venture will provide the appropriate Agilent Business Unit Managers with the first (1st) serial number, first shipping date, Order number and quantity

of Product to be included in that first shipment of Product incorporating the change.

16.5    Emergency Change Request.    Venture agrees to acknowledge all emergency change requests within one (1) business day, such acknowledgments to include at a minimum, a date on which Venture will respond to Agilent with the conditions (including but not limited to price and delivery impact) for implementing the proposed changes.    An emergency will be defined as a severe situation, including Product safety, Product quality or a line shut down.    Upon both Parties' agreement on the price, delivery, or any other conditions impacted by the emergency change request, Agilent will issue a Change Order to Venture reflecting these new terms and conditions.

## 17.0  Agilent Property

17.1    Ownership of Agilent Property.    Venture hereby acknowledges that Agilent will at all times retain all right, title and interest in Agilent Property furnished to Venture.    In addition, Venture further acknowledges that such property will, at all times, constitute Bailed Property. Venture hereby grants Agilent its power of attorney to file UCC financing statements or similar notices describing the Agilent Property and the proceeds thereof, wherever Agilent deems appropriate to provide notice to other parties that the Agilent Property is not property of Venture.    Should this Agreement or the transactions under this Agreement be deemed for any reason to pass title to the Agilent Property to Venture, Venture agrees that Agilent will be deemed to hold, and Venture hereby grants to Agilent, a purchase money security interest in the Agilent Property and the proceeds thereof, to secure all of its obligations to Agilent, including its obligation to return Agilent Property and Venture's other obligations under this Agreement.

17.2    Agilent Property.    Venture agrees to take all necessary steps to ensure that all Agilent Property will be:

17.2.1  clearly marked as the property of Agilent Technologies, Inc.;

17.2.2  and remain personal property, and not become a fixture to real property;

17.2.3  subject to inspection by Agilent at any time upon reasonable advance notice in accordance with Section 15 and 17.6;

17.2.4  used only in the performance of this Agreement;

17.2.5  kept free of Encumbrances; and

17.2.6  at all times located at Venture's manufacturing sites listed in Exhibit K; and

17.2.7  kept separate or identifiable from other materials, Tools or property of Venture or held by Venture.

17.3    Additional Covenants.    Venture covenants and agrees that, until termination of this Agreement:

17.3.1  Venture will not represent to any other party that it owns Agilent Property;

17.3.2  Venture will not modify any Agilent Property in any manner without prior written

AGILENT CONFIDENTIAL

permission from Agilent; and

17.3.3  Within two (2) business days of the execution of this Agreement, Venture will deliver written notice to existing secured creditors in form and substance satisfactory to Agilent to the effect that Agilent Property located at Venture sites is the property of Agilent.   Venture will deliver a copy of the notice to Agilent concurrently with its delivery of such notice and will promptly provide Agilent with copies of any replies and related correspondence that it receives from such secured creditors.  In connection with any future agreement by Venture to pledge any of its assets or properties, Venture will secure and concurrently deliver to Agilent such secured creditor's written acknowledgment that Agilent Property will remain the property of Agilent in form and substance satisfactory to Agilent. Venture will execute and deliver such further documents and do such other acts and things as Agilent may reasonably request in order to effect fully the purposes of this Agreement.

17.4  <u>Maintenance and Calibration</u>.   Venture will put in place a system to ensure that Agilent Property consisting of test equipment provided to Venture is calibrated before use. Calibration will be done annually, or as required, and be done to industry acceptable standards (CGMP Standards) or as otherwise specified by Agilent.   Venture will be held liable for any repair and replacement costs, normal wear and tear excepted, if damage to such test equipment is solely caused by Venture.   Maintenance and calibration costs and other related direct costs of other Agilent Property are to be mutually agreed to by Agilent and Venture.

17.5  <u>Return of Agilent Property</u>.   Upon Agilent request, or upon the expiration or termination of this Agreement, Venture will return all Agilent Property to Agilent in good condition, normal wear and tear accepted.   Agilent will determine the manner and procedure for returning the Agilent Property.   Agilent may impose charges if Venture fails to return the Agilent Property in such condition or within the return time frame agreed upon.   Agilent will pay all return costs.    Agilent Property will be shipped FCA (Shipping Dock at Venture's manufacturing facility).  In the event that Agilent exercises its right to remove any of the Agilent Property, Venture will cooperate fully and will not hinder or obstruct Agilent's actions in any way.

17.6  <u>Record and Audits of Agilent Property</u>.   Venture will maintain accurate records of the receipt and location of all Agilent Property, so that it may be identified with particularity. Agilent will have the right to conduct physical inventory audits of all Agilent Property located at Venture facilities with five (5) business days written notice, provided such audits will be performed within business hours and will not unduly interfere with Venture's operations. Such audits will be at no charge to either Party.

17.7  <u>Warranty Disclaimer</u>.  EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, ALL AGILENT PROPERTY IS PROVIDED "AS-IS" WITH NO WARRANTIES WHATSOEVER, EITHER EXPRESSED OR IMPLIED, AND ORAL OR WRITTEN. AGILENT   SPECIFICALLY   DISCLAIMS   ANY   WARRANTIES   OF

AGILENT CONFIDENTIAL

MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

17.8    Risk of Loss.    Venture will bear all risk of loss with respect to Agilent Property from receipt until return to Agilent.

17.9    Software.    Any software or firmware provided to Venture by Agilent is licensed to Venture non-exclusively for use solely to perform its obligations under this Agreement.    Such software and firmware may not be transferred or sublicensed and may not be disassembled or decompiled without Agilent's express written consent.

17.10   Agilent Tools.    Agilent will own all rights in any Tools exclusively paid for by Agilent but under Venture's or Venture's subcontractors possession.    Tools are subject to the provisions regarding Agilent Property specified above.    Venture will fully qualify all new Tools, after both Parties have mutually agreed upon the cost for such qualification, and obtain Agilent's written approval before they are used in Venture's top-level production line.    Venture will send Agilent a copy of its qualification report.    In the event that Agilent does not concur with Venture's qualification results, Agilent has the right to reject the use of the new Tools until corrective actions are taken.    The cost for such corrective actions shall be mutually agreed upon by both parties.

17.11   Tools Maintenance.    As long as the Tools are used in the manufacturing of the Agilent Products, Venture will maintain the Tools in good working condition.    In the event that Venture considers it necessary to renew the Tools for manufacturing the Agilent Products, or to add alterations to the existing Tools to meet Agilent's Requirements or requests, Venture will notify Agilent for approval prior to the actual implementation.    Agilent will not withhold the approval unreasonably.    Unless agreed otherwise by Parties on a Business Unit Addendum, the costs required for such renewals or alterations will be borne by Agilent via a Non-Recurring Expense (NRE) process.    Agilent will own all rights in any modifications or improvements to the Tools and Venture agrees to assign over such rights to Agilent.

## 18.0   Venture Intellectual Property Defense

18.1    Duty to Defend.    Except as provided in Section 18.4, Venture will, at its expense, defend or settle any claim made or any suit or proceeding brought against Agilent based on an allegation that Venture's manufacturing processes used in any of the Deliverables constitute an infringement or unauthorized use of any third party's Intellectual Property Rights (a "Third Party Claim").    Venture will pay all costs, damages and expenses awarded for a court or agreed to in settlement, arising from a Third Party Claim.

18.2    Duty to Notify.    Agilent will give Venture prompt notice of any Third Party claim, and will give Venture the authority, information, and assistance (at Venture's expense) to handle the defense.    If Venture does not diligently pursue resolution of the claim nor provide Agilent with reasonable assurance that it will diligently pursue resolution, then Agilent may, without limiting its other rights and remedies, take responsibility for the defense.

18.3    Remedies.    If the use of a Venture manufacturing process or a Deliverable is enjoined

based on a claim of infringement, Venture will, at its sole expense and option:

18.3.1 Procure the right for Venture to continue using the process for Agilent the right to continue using the Deliverable;

18.3.2 Replace the process or Deliverable with a non-infringing process or product of equivalent function and performance;

18.3.3 Modify the process or Deliverable to be non-infringing, without detracting from function or performance of the affected Deliverable; or

18.3.4 If none of these remedies is available after Venture expends all reasonable efforts, then refund to Agilent any payments made with respect to the affected Deliverables. If Venture discontinues supplying a Deliverable as a result of Third Party Claim contemplated under this Section, then Venture agrees to reimburse Agilent for its reasonable costs and expenses in procuring a reasonable substitute, including costs associated with migrating its Requirements to a new contract manufacturer's process.

18.4    <u>Limitation.</u>    Venture will be relieved of its obligations hereunder to the extent that the claim of infringement or unauthorized use against Agilent arises solely and directly from Product Requirements.   This Section states Venture's entire liability for any Third Party Claims against Agilent arising hereunder.

## 19.0 Agilent Intellectual Property Defense

19.1    <u>Duty to Defend.</u>    Except as provided in <u>Section 19.4</u> below, Agilent will, at its own expense, defend or settle any Third Party Claim brought against Venture based upon an allegation that the Product Requirements or Agilent Property provided to Venture constitute an infringement or unauthorized use of the third party's Intellectual Property. Agilent will pay all costs, damages and expenses awarded by a court or agreed to in settlement, arising from such Claim.

19.2    <u>Duty to Notify.</u>    Venture will give Agilent prompt notice of any Third Party Claim, and will give Agilent the authority, information, and assistance (at Agilent's expense) to handle the defense.   If Agilent does not diligently pursue resolution of the claim nor provide Venture with reasonable assurances that it will diligently pursue resolution, then Venture may, without limiting its other rights and remedies, take responsibility for the defense.

19.3    <u>Remedies.</u>   If use of the Product Requirements (except to the extent that such infringement exists as a result of Venture's manufacturing processes), or Agilent Property is enjoined, Agilent will, at its sole expense and option:

19.3.1 Procure for Venture the right to continue using the Product Requirements or Agilent Property;

19.3.2 Replace the Product Requirements or Agilent Property so that they are no longer subject to the Third Party Claim;

19.3.3 Modify the Product Requirements or Agilent Property so that they are no longer

subject to the Third Party Claim; or

19.3.4 If none of these options is reasonably available, terminate this Agreement.

19.4 <u>Limitation</u>.   Agilent will be relieved of its obligations hereunder to the extent that the claim of infringement or unauthorized use against Venture does not arise solely and directly out of compliance with Product Requirements or out of use of the Agilent Property.   This Section states Agilent's entire liability for any Third Party Claims against Venture arising hereunder.

## 20.0  Confidential Information

20.1 <u>Confidential Information</u>.   During the Term, a Party (the "Recipient") may receive or have access to certain information of the other Party (the "Discloser") that is marked as "Confidential," including information or data concerning the Discloser's intellectual property, products or product plans, business operations, strategies, customers and related information.   The Parties will be bound by the terms of the Confidential Disclosure Agreement (CDA) attached as <u>Exhibit D</u>.   To the extent any term of this Agreement conflicts with any term in the CDA, the terms of this Agreement will control and take precedence.   Confidential Information, as defined in the CDA, may only be used by those employees or temporary employees of the Recipient who have a need to know such information for purposes related to this Agreement.   The AVL, Bill of Material, Forecasts, Orders, Product Requirements and other information identified in this Agreement as Agilent confidential must be held in confidence by Venture under the terms of the CDA. Notwithstanding the foregoing, Venture may provide Agilent's Confidential Information to Venture's subcontractors or suppliers, provided that Venture binds such third parties to substantially similar confidentiality obligations.

## 21.0  Governmental Compliance

21.1 <u>Duty to Comply</u>.   Venture agrees to comply with all federal, state, local and foreign laws, rules and regulations of any Governmental Authority applicable to its manufacturing of the Products.   Any approvals necessary to allow for Agilent's sale and customers' use of the Products will be mutually agreed upon by both Parties.   Without limiting the generality of the foregoing sentence, Venture represents that:

21.1.1 Venture will comply with all equal employment opportunity and non-discrimination requirements prescribed by Presidential Executive Orders, including the requirements of Executive Order 11246, the Vocational Rehabilitation Act, and the Vietnam Era Veterans' Readjustment Assistance Act;

21.1.2 Venture does not manufacture Agilent Product with under-age or forced labor as defined by local laws, or, if there are no applicable local laws, basic international principles relating to labor standards.

21.1.3 All Agilent Products will be shipped in conformance with government or freight regulations and requirements applicable to chemicals; and

21.1.4 Upon Agilent's request, Venture will provide complete and accurate material safety

data sheets.

21.2    <u>Procurement Regulations.</u>  For Products purchased under this Agreement for incorporation into products to be sold under a federal contract or subcontract, those applicable procurement regulations that are required by federal statute or regulation to be inserted in contracts or subcontracts will be specified in the Business Unit Addendum and made applicable to all Orders for such Business Unit Addendum.  In addition, when applicable, Venture will manufacture the Products that Agilent will sell to U.S. government agencies in accordance with the applicable procurement regulations of the agency, including country of manufacture, provided that Agilent discloses such requirements in Order.

21.3    <u>Ozone Depleting Substances.</u>  Venture certifies that their processes used to manufacture any Agilent Product does not contain any "Class 1 Substance", or "Class 2 Substance", as those terms are defined in 42 USC Section 7671 and implementing regulations of the United States Environmental Protection Agency at 40 CFR Part 82, as now in existence or hereafter amended.

## 22.0  Country of Manufacture and Duty Drawback Rights

22.1    <u>Country of Origin Certification.</u>   Upon Agilent's request, Venture will provide Agilent with an appropriate certification stating the country of origin for the Products (but not the Components comprising the Products), sufficient to satisfy the requirements of any applicable United States export licensing regulations.

22.2    <u>Country of Origin Marking.</u>  Venture will mark each Product, or the container if there is no room on the Product, with the country of origin.

22.3    <u>Duty Drawback.</u>   If Products delivered under this Agreement are imported, Venture will when possible allow Agilent to be the importer of record.  If Agilent is not the importer of record and Venture obtains duty drawback rights to such Products, Venture will, upon Agilent's request, provide Agilent with documents required by the customs authorities of the country of receipt to prove importation and to transfer duty drawback rights to Agilent.

## 23.0  Electronic Data Interchange (EDI) Requirements

23.1    <u>EDI Implementation.</u>   It is Agilent's intent to utilize applicable EDI transactions (ANSI X.12, EDIFACT, or other similar electronic data exchange) wherever feasible to facilitate the timely communication of information between Agilent and Venture.   Agilent and Venture agree to provide adequate resources (personnel and technology) to effectively implement EDI applications in a timeframe to be mutually agreed to by Agilent and Venture.   Specific mapping (for EDI) will include, but not be limited to:

a)    Component Forecasts (per the specific requirements as set forth in <u>Exhibit I</u>);

b)    Forecasts to Venture, Orders to Venture; and

    c)    Venture shipment notices and invoices (as specifically required by Exhibits). <u>Exhibit B</u> and the Business Unit Addendum and Exhibits may contain other EDI requirements and guidelines.

23.2    <u>IT Systems.</u>  Agilent and Venture agree to work jointly, in good faith to co-develop and implement IT solutions, as needed to improve all communications contemplated under this Agreement.

## 24.0 Force Majeure Events

24.1    <u>Delaying Causes.</u>  Subject to the provisions of this Section, neither Party will be liable for any delay in performance under this Agreement caused by any "act of God" or other cause beyond that Party's reasonable control and without that Party's fault or negligence, including but not limited to, any act by any Governmental Authority, act of war, strike, boycott, embargo, riot, lockout, labor dispute, or civil commotion causing delays. Notwithstanding the above, neither Party will be relieved of any liability for any delay or failure to perform its defense obligations with respect to third party Intellectual Property Rights or furnish remedies for infringement as described in <u>Sections 18 and 19</u> above. Except as otherwise more specifically provided for in this Agreement, each Party experiencing a delaying cause will immediately give the other notice of such delaying cause and an estimate of its duration, and the other Party may act in its sole discretion to terminate this Agreement or any part hereof or suspend this Agreement in whole or in part for the duration of the delaying cause.

24.2    <u>Resumption of Agreement.</u>  The Parties may resume performance under this Agreement once the delaying cause ceases and extend the Term up to the length of time the delaying cause endured. Unless a Party gives notice of termination as provided above within thirty (30) calendar days notice of the delaying cause, that Party will be deemed to have elected to suspend this Agreement for the duration of the delaying cause.

## 25.0 Events of Default

25.1    <u>Notice of Breach.</u>  If either Party is in Breach of any provision of this Agreement, the non-breaching Party may, by notice to the breaching Party, except as otherwise prohibited by the United States bankruptcy laws, terminate the whole or any part of this Agreement or any Order, unless the breaching Party cures the Breach within thirty (30) calendar days after receipt of notice.

25.2    <u>Causes of Breach.</u>  For purposes of this Agreement, the term "Breach" includes any:

    a)    proceeding, whether voluntary or involuntary, in bankruptcy or insolvency by or against a Party;

    b)    appointment, with or without a Party's consent, of a receiver or an assignee of a Party for the benefit of creditors;

    c)    failure by Venture to make a delivery of Products affecting more than fifteen (15) percent (15__%), based upon a three (3) month rolling average of the outstanding

deliveries of any individual product in accordance with the requirements of this Agreement or any Accepted Order that is not excused by Force Majeure;

d)    failure by Venture to replace or repair Non-Conforming Products in a timely manner as required hereunder; or

e)    other failure by a Party to comply with any material provision of this Agreement with additional failure to provide the non-breaching Party, upon request, with reasonable assurances of future performance.

## 26.0  Termination

26.1    Termination For Convenience.   Agilent may terminate this Agreement hereunder for any reason at its convenience upon one hundred eighty (180) calendar days prior written notice.

26.2    Effect of Expiration or Termination.   Upon expiration or termination of this Agreement, the Parties agree to the following terms regarding the relevant Agilent Property and Termination Inventory:

a)    all Orders issued prior to the effective date of the termination or expiration will be fulfilled pursuant to and subject to the terms of this Agreement, even if the Delivery Dates of Products under such Orders are after the effective date of expiration or termination; and

b)    all licenses granted by Agilent to Venture to any Agilent Property or Intellectual Property will automatically terminate at the end of the Support Life as set forth in Section 12.1 or upon earlier termination or expiration of this Agreement.

26.3    Survival.  The rights and obligations under the following Sections of this Agreement will survive any expiration or earlier termination of this Agreement in accordance with their terms: Section 2 ("Definitions); 4 ("Ownership"); 7 ("Prices and Payment Terms"); 10 ("Warranties"); 11 ("Product Support"); 17 ("Agilent Property"); 18 ("Venture Intellectual Property Defense"); 19 ("Agilent Intellectual Property Defense"); 20 ("Confidential Information"); 21 ("Governmental Compliance"); 26 ("Termination"); 27 ("Limitation of Liability"); and 30 ("Miscellaneous").

26.4    Agilent Obligations upon Complete or Partial Termination.  In the event of a complete or partial termination of this Agreement by either Party, Agilent will reimburse Venture for any mutually agreed non-amortized Venture costs associated with Product not originally funded through Non-Recurring Engineering (NRE) charges.  In addition, in the event of a complete or partial termination of this Agreement (i) by Venture for cause as provided in Section 25.1 above (ii) by Agilent, for convenience as provided in Section 26.1 above, or for cause as provided in Sections 25.1 or 19.3.4 above; or (iii) by either party in the event of a force majeure event as described in Section 24.1 above, the Parties agree to take the following actions:

26.4.1  Venture will identify any Components in inventory, and Agilent will have the right of first refusal to purchase such Components;

26.4.2 Venture will use commercially reasonable efforts to cancel its purchase commitments or return for credit or find other use for all Components intended for use in the Product (including all Components rendered excess/obsolete by Engineering Changes or Manufacturing Changes, or COs);

26.4.3 Venture will cancel all cancelable, pending orders to Component Suppliers immediately and in any case, no more than one (1) week from the date of notification by either Party of the complete or partial termination of this Agreement, and will also notify Agilent in writing of the date the cancellations are completed. Agilent will not be liable for orders with Component Suppliers where Venture has not issued a cancellation notice within this one (1) week period unless expressly notified by Venture and approved by Agilent in writing;

26.4.4 Agilent will reimburse Venture for all validated actual costs, charges and fees incurred to return any portion of the Termination Inventory to Component Suppliers. All costs will be justified by appropriate documentation; and

26.4.5 Agilent will reimburse Venture for Termination Inventory remaining after Venture has taken those steps required above. Any such reimbursement will be: (i) at Venture's quoted price for Turnkey Components to Agilent; (ii) at Agilent's selling price to Venture for Buy-Sell Components; and (iii) the purchase price in effect at the date of cancellation for finished Products.

26.5    Agilent's Rights Upon Termination.  In the event of termination by Agilent, Venture will provide Agilent the following:

a)    All Agilent Property (unless sold to Venture pursuant to the terms of this Agreement or otherwise agreed in a Business Unit Addendum)

b)    Any other documentation or materials as set forth in Section 13.2 above;

c)    Product routings and panelization drawings developed by Venture or third parties under its direction solely for Agilent in manufacturing Products;

d)    Consulting Services as described in Section 13.3 above;

e)    Any other rights specified in Section 13 above Developments; and

f)    Any other information that is unique to the Products and is required to manufacture such Products.

In the event Agilent terminates this Agreement in whole or in part on account of a material breach by Venture and failure of Venture to cure such material breach after being given a reasonable opportunity mutually agreed to between the parties or if Venture ceases to offer manufacturing capabilities substantially similar to those as of the Effective Date for a particular Product or Products, in addition to the manufacturing rights described in Section 13.2 above, Agilent may procure, upon such terms and in such manner as Agilent reasonably deems appropriate, manufacturing services and products similar to the Products and services as to which this Agreement is terminated.  Venture agrees to reimburse Agilent upon demand for all reasonable additional costs incurred by Agilent in procuring,

qualifying and testing such similar products and services, which the Parties acknowledge to be direct damages to Agilent for the purposes of this Agreement. Venture further agrees to continue the performance of this Agreement to the extent not terminated under the provisions of this Section. In the event of failure of the parties to agree on the costs payable under this provision, parties will rely on the Escalated Dispute Resolution process set out in Section 30.12.

## 27.0 Limitation of Liability

NEITHER PARTY WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES TO THE OTHER (INCLUDING LOSS OF PROFITS) ARISING OUT OF ANY PERFORMANCE OF THIS AGREEMENT OR IN FURTHERANCE OF THE PROVISIONS OR OBJECTIVES OF THIS AGREEMENT, REGARDLESS OF WHETHER SUCH DAMAGES ARE BASED ON TORT, WARRANTY, CONTRACT OR ANY OTHER LEGAL THEORY, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING THE ABOVE, EACH PARTY WILL BE RESPONSIBLE FOR ANY DAMAGES OF ANY KIND INCLUDED IN AN AWARD OR SETTLEMENT OF A THIRD PARTY INTELLECTUAL PROPERTY CLAIM UNDER SECTIONS 18 OR 19, OR ANY DAMAGES ARISING FROM DEATH OR BODILY INJURY. IN ADDITION, EACH PARTY WILL BE RESPONSIBLE FOR ALL DAMAGES, OF ANY KIND, SUFFERED AS A RESULT OF ANY UNAUTHORIZED DISCLOSURE OF THE OTHER PARTY'S TRADE SECRETS WHERE SUCH DISCLOSURE RESULTS IN ACTUAL DAMAGES.

## 28.0 Insurance Requirements

During the Term and at all times that Venture performs work for Agilent, Venture shall maintain in full force and effect, at Venture's own expense, insurance coverage to include:

28.1     Workers Compensation and Employer's Liability.  Workers' Compensation insurance will be provided as required by law or regulation where the work under this Agreement is performed.  Employer's Liability insurance will be provided in amounts not less than US$500,000 per occurrence.  Where parties mutually agree to any additional coverage or variation of the terms herein, these will be reflected in the Business Unit Addendum. Where permitted by law, such policies will contain waivers by the insurer's subrogation rights against Agilent.

28.2     General Liability.  Venture will maintain Comprehensive or Commercial General Liability Insurance (including but not limited to premises and operations, products and completed operations, broad form contractual liability, broad form property damage and personal injury liability).  Comprehensive General Liability policy limits shall be not less than a Combined Single Limit for Bodily Injury, including death, and Property Damage of US$20,000,000 per occurrence.

Commercial General Liability (Occurrence) policy limits shall be not less than US$20,000,000 per occurrence (combined single limit for bodily injury and property damage) and US$20,000,000 General Aggregate to the extent that such damages arise from Venture's negligent manufacturing of the Products or to the extent such damages is

proximately caused by the negligent and/or intentional acts or omissions of Venture under this Agreement.

Such policies will name Agilent as Additional Insureds and the insurance afforded Additional Insureds will apply as primary insurance and no other insurance will be called upon to contribute to a loss covered thereunder.

In addition, such policies will permit Venture to waive, on its own behalf and on behalf of its insurers, any rights of subrogation against Agilent. Such insurance policies will be written with appropriately licensed and financially responsible insurers, and will provide for a minimum of thirty (30) days written notice to Agilent of any cancellation or reduction in coverage.

28.3    Claims Made Coverage.  If any policies have "claims made" coverage, Venture will maintain such coverage's with Agilent named as an additional insured for a minimum of three years after termination of this Agreement.  Any such coverage must have a retroactive date no later than the date upon which work commenced under this Agreement.

28.4    Certificates of Insurance evidencing the required coverage and limits as set forth in Section 28.1 and Section 28.2 above will be furnished to Agilent before any work is commenced hereunder. Venture will deliver Certificates to the Agilent Global Account Manager.

28.5    Additional Requirements. All deductibles on policies providing coverage will be paid by Venture.  In the event Venture is self insured for matters described above, Venture agrees to respond to any claims or losses made against or incurred by Agilent in the same fashion as if insurance had been purchased with the same or broader coverage terms than what is generally available to similar CMs.   In no event will the coverage's or limits of any insurance required under this Section, or the lack or unavailability of any other insurance, be deemed to limit or diminish Venture's obligations or liability to Agilent under this Agreement.

## 29.0  Business Continuity Plan

29.1    Risk Management and Continuity Plans.  Venture will develop and keep current a formal Business Continuity Plan detailing Venture's plans, procedures, and designated resources for timely response to and recovery from potential civil, natural, and physical plant disasters that could reasonably be expected to disrupt production and delivery to Agilent. Upon request, Venture will make such plan available to Agilent's Global Account Manager or its designated representative for review. In addition, Agilent Business Unit Managers may request a specific Business Continuity Plan for that Agilent Business Unit.

29.2    Notification.  Venture agrees to notify Agilent as soon as possible in the event of a crisis that disrupts manufacturing or delivery of Products.   Unless otherwise authorized by Agilent's Global Account Manager, Venture will not make any references to Agilent in any public communications about the crisis and subsequent recovery.

29.3    Loss Control.  Venture will be responsible for maintaining the facility and operations in

accordance with applicable fire protection and loss control standards. Venture will, with reasonable notice, allow Agilent and their designated representative to visit and conduct loss control evaluations of the facility and operations.

## 30.0 Miscellaneous

30.1    Notices. All notices to be given under this Agreement must be in writing addressed to the Party's Global Account Manager designated in Exhibit A, or with respect to Agilent, to a Business Unit Manager if so required under a Business Unit Addendum. Notices are validly given upon the earlier of confirmed receipt by the receiving Party or three (3) calendar days after dispatch by reputable courier or certified mail, return receipt requested, postage prepaid, properly addressed to the receiving Party. Notices may also be delivered by telefax or similar means of recorded electronic communication and will be validly given upon written confirmation of receipt. Either Party may change its designated contact and address for purposes of notice by giving notice to the other Party in accordance with these provisions.

30.2    Exhibits. Each of the following Exhibits attached to this Agreement is deemed a part of this Agreement and incorporated herein wherever reference to it is made:

| | |
|---|---|
| Exhibit A | Administration and Notices |
| Exhibit B | Agilent General Technical Specifications and Reference Standards |
| Exhibit C | Cost Breakdown - Request for Quote (RFQ) Format |
| Exhibit D | Confidential Disclosure Agreement |
| Exhibit E | Agilent Part Return Billing Process |
| Exhibit F | Pricing Review Schedule and Detail |
| Exhibit G | Pricing Model Example |
| Exhibit H | Reporting Requirements |
| Exhibit I | Component Forecast Requirements |
| Exhibit J | Venture Performance Metrics - TQRDCEb Requirements |
| Exhibit K | Authorized Venture Manufacturing Sites |
| Exhibit L | List of Agilent Eligible Buyers |
| Exhibit M | Intentionally Left Blank |
| Exhibit N | Shipping Instructions |
| Exhibit O | Excess Component Inventory Carrying Charges |
| Exhibit P | Component Allocation Requirements |
| Exhibit Q | Form of Business Unit Addendum |
| Exhibit R | Joint Invention Agreement |

30.3    Reference to Days. All references in this Agreement to "days" will, unless otherwise specified herein, mean calendar days.

30.4    Independent Contractors. Each Party represents and warrants to the other that its relationship with the other under this Agreement will be as an independent contractor and neither Party is a partner, employee, agent or joint venturer of or with the other.

AGILENT CONFIDENTIAL

30.5    Severability.  If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable in any respect, such determination will not impair or affect the validity, legality or enforceability of the remaining provisions hereof, and each provision is hereby declared to be separate, severable and distinct.  To the extent that any such provision is found to be invalid, illegal or unenforceable, the Parties hereto will negotiate in good faith to substitute for such provision, to the extent possible, a new provision that most nearly effects the Parties' original intent in entering into this Agreement or to provide equitable adjustment in the event no such provision can be added. The other provisions of this Agreement will remain in full force and effect.

30.6    Hierarchy of Documents.  Unless otherwise specifically agreed to by the Parties, in the event of any conflict between the provisions of this Agreement and Exhibits negotiated either prior to or subsequent to this Agreement, the order of precedence is as follows:

(i)    any Agilent Business Unit Addendum or SOW and any Exhibits thereto;

(ii)    this Agreement, its Exhibits; and then

(iii)    the front of each Agilent Purchase Order that is acknowledged by Venture. Unless otherwise specifically agreed, the Parties acknowledge that the pre-printed provisions on the reverse side of any such quotation, Order, acknowledgment or invoice will be deemed deleted and of no effect whatsoever.

30.7    Entire Agreement.   This Agreement, together with the Exhibits and Business Unit Addenda and SOWs, constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether written or oral; for purposes of construction, this Agreement will be deemed to have been drafted by both Parties.   No modifications, amendments, or waiver of any term, condition, or provision of this Agreement will be binding on either Party unless in writing and signed by an authorized representative of each Party.

30.8    Governing Law.  This Agreement will be governed in all respects by the laws of the State of California without reference to the conflict of laws provisions.   In the event of any dispute that is not resolved under the dispute resolution procedures provided below, the Parties agree that suit may be brought only in a court of competent jurisdiction in the State of California.

30.9    Assignment.   Neither this Agreement nor any right, license, privilege or obligation provided herein may be assigned, transferred or shared by either Party without the other Party's prior written consent, and any attempted assignment or transfer is void.   Any merger, consolidation, reorganization, transfer of substantially all assets of a Party, or other change in control of ownership will be considered an assignment for the purposes of this Agreement, unless the surviving entity is a wholly owned subsidiary of a Party.   This Agreement will be binding on the successors and permitted assignees of the parties and the name of the parties appearing herein will be deemed to include the names of Eligible Buyers or Authorized Venture Manufacturing Sites and the above parties' successors or permitted assignees to the extent necessary to carry out the intent of this Agreement.

30.10 <u>No Publication.</u>  Neither Party may publicize or disclose to any third party, without the written consent of the other Party, the terms of this Agreement.   Without limiting the generality of the foregoing sentence, no press releases may be made without the prior written mutual consent of each Party.

30.11 <u>Headings</u>.  The section headings in this Agreement are for convenience of reference only. The headings will not limit or extend the meaning of any provision of this Agreement, and will not be relevant in interpreting any provision of this Agreement.   The plural will be deemed to include the singular, and the singular will be deemed to include the plural.

30.12 <u>Dispute Resolution</u>.   Prior to any Party pursuing legal remedies hereunder, the Parties' Global Account Managers agree to negotiate in good faith to resolve any disputes arising during the performance of the Agreement that cannot be resolved by Business Unit, Site or Tactical Managers.   If such negotiations and meetings do not resolve the dispute within five (5) business days after notice of the dispute, then a Senior Vice President from each Party will meet face to face within ten (10) business days or as mutually agreed between them to attempt to resolve such dispute.   If the dispute is not resolved to the satisfaction of these executives within three (3) business days, then either Agilent or Venture may terminate this Agreement in whole or in part and pursue all available legal remedies.

IN WITNESS WHEREOF, the Parties have executed this Global Manufacturing Services Agreement as of the date first written above.

AGILENT TECHNOLOGIES, INC.                VENTURE MANUFACTURING (S) LTD.


By: _____          By: _____

Name:  Ian Ross                           Name:  N. L. Wong


Title: Vice President and General Manager   Title:   President & CEO
       Worldwide Order Fulfillment and
       Manufacturing

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

**I. (a) PLAINTIFFS**

AVAGO TECHNOLOGIES U.S., INC., a Delaware corporation; AVAGO TECHNOLOGIES INTERNATIONAL SALES PTE. LIMITED, AVAGO TECHNOLOGIES JAPAN, LTD., AVAGO TECHNOLOGIES CANADA CORPORATION

**DEFENDANTS**

EMCORE CORPORATION, a New Jersey corporation; VENTURE CORPORATION LIMITED fka VENTURE MANUFACTURING (S) LTD., a Singapore corporation

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

John V. Picone III
Dori L. Yob
Hopkins & Carley, a Law Corporation, 70 South First Street
San Jose, CA 95113
(408) 286-9800

Attorneys (If Known)

C08   03248   HRL

E-FILING

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [X] 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [X] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury - Med. Malpractice | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal 28 USC 157 | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 365 Personal Injury - Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881 | | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 450 Commerce |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 340 Marine | **PERSONAL PROPERTY** | [ ] 650 Airline Regs. | [ ] 830 Patent | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 345 Marine Product Liability | [ ] 370 Other Fraud | [ ] 660 Occupational Safety/Health | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 690 Other | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | **LABOR** | [ ] 861 HIA (1395ff) | [ ] 810 Selective Service |
| [X] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 710 Fair Labor Standards Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/Exchange |
| [ ] 195 Contract Product Liability | | | [ ] 720 Labor/Mgmt. Relations | [ ] 863 DIWC/DIWW (405(g)) | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 730 Labor/Mgmt. Reporting & Disclosure Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | [ ] 441 Voting | [ ] 510 Motions to Vacate Sentence | [ ] 740 Railway Labor Act | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 442 Employment | **Habeas Corpus:** | [ ] 790 Other Labor Litigation | **FEDERAL TAX SUITS** | [ ] 892 Economic Stabilization Act |
| [ ] 220 Foreclosure | [ ] 443 Housing/Accommodations | [ ] 530 General | [ ] 791 Empl. Ret. Inc. Security Act | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 444 Welfare | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS - Third Party 26 USC 7609 | [ ] 894 Energy Allocation Act |
| [ ] 240 Torts to Land | [ ] 445 Amer. w/Disabilities - Employment | [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | [ ] 895 Freedom of Information Act |
| [ ] 245 Tort Product Liability | [ ] 446 Amer. w/Disabilities - Other | [ ] 550 Civil Rights | [ ] 463 Habeas Corpus - Alien Detainee | | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 290 All Other Real Property | [ ] 440 Other Civil Rights | [ ] 555 Prison Condition | [ ] 465 Other Immigration Actions | | [ ] 950 Constitutionality of State Statutes |

**V. ORIGIN** (Place an "X" in One Box Only)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. §1332

Brief description of cause:
Breach of Contract, Breach of Express Warranty, and Negligent Interference with Prospective Economic Advantage

**VII. REQUESTED IN COMPLAINT:**

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: [X] Yes  [ ] No

**VIII. RELATED CASE(S) IF ANY**

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

**IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)** (PLACE AND "X" IN ONE BOX ONLY)

- [ ] SAN FRANCISCO/OAKLAND
- [X] SAN JOSE

DATE
July 3, 2008

SIGNATURE OF ATTORNEY OF RECORD
Hopkins & Carley

NDC-JS44